United States Court of Appeals
For the First Circuit



No. 98-1246

SUSAN M. ROSENBERG,

Plaintiff, Appellee,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH INC. and JOHN WYLLYS,

Defendants, Appellants.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]



Before

Boudin, Circuit Judge,

Wellford, Senior Circuit Judge,*

and Lynch, Circuit Judge.


Allan Dinkoff, with whom Christopher P. Litterio, Barry Y.
Weiner, Shapiro, Israel & Weiner, P.C., Mark K. Dichter, Joseph J.
Costello, Marifrances Dant Bolger, and Morgan, Lewis, & Bockius LLPwere on brief, for appellants.
Marc Redlich, with whom Merle Ruth Hass, Law Offices of Marc
Redlich, and Richard P. Goodkin were on brief, for appellees.
Sally Dunaway, Cathy Ventrell-Monsees, AARP Foundation
Litigation, Melvin G. Radowitz, and American Association of Retired
Persons on brief for amicus curiae American Association of Retired
Persons.


* Of the Sixth Circuit Court of Appeals, sitting by designation.
Joel Z. Eigerman, Roche, Carens & DeGiacomo, P.C., and Jeffrey
M. Friedman on brief for amicus curiae American Jewish Congress.
Erin Quinn Gery, Ann Elizabeth Reesman, McGuiness & Williams, 
Stephen A. Bokat, Robin S. Conrad, Sussan L. Mahallati, and
National Chamber Litigation Center, Inc. on brief for amici curiae
Equal Employment Advisory Council and The Chamber of Commerce of
the United States.
Robert J. Gregory, with whom C. Gregory Stewart, Philip B.
Sklover, and Lorraine C. Davis were on brief, for amicus curiae
Equal Employment Opportunity Commission.
Michael Rubin, Altshuler, Berzon, Nussbaum, Berzon & Rubin,
Cliff Palefsky, and McGuinn, Hillsman & Palefsky on brief for amici
curiae National Employment Lawyers Association, NOW Legal Defense
and Education Fund, National Women's Law Center, and National
Partnership for Women and Families.
Russell E. Brooks, Stacey J. Rappaport, and Milbank, Tweed,
Hadley & McCloy on brief for amicus curiae New York Stock Exchange,
Inc.
Jody E. Forchheimer, Rinchelle S. Kennedy, and Bingham Dana
LLP on brief for amicus curiae The Securities Industry Association.
Susan Von Struensee on brief for amicus curiae Susan Von
Struensee.
Sydelle Pittas and Pittas \\ Koenig on brief for amicus curiae
The Women's Bar Association (of Massachusetts). 


February 24, 1999

LYNCH, Circuit Judge. The question raised is whether
Congress intended to prohibit enforcement of pre-dispute
arbitration agreements covering employment discrimination claims
under Title VII and the Age Discrimination in Employment Act as a
matter of law in all cases or at least under certain facts said to
be present here. Every circuit that has considered the issue save
one has upheld the use of such agreements. The case here, in which
the district court refused to compel a plaintiff to arbitrate such
claims when the employer wished to arbitrate under a pre-dispute
agreement, has also drawn much attention in the form of nine briefs
amici curiae.
The plaintiff, Susan Rosenberg, signed a standard
securities industry form, the "U-4 Form," agreeing to arbitrate
certain claims after being hired by Merrill Lynch, Pierce, Fenner
& Smith as a trainee financial consultant. The form itself did not
state which claims were to be arbitrated, but rather referred to
the rules of various organizations with which Rosenberg was
registering. When her employment was later terminated, Rosenberg
filed suit alleging age and gender discrimination and related
claims. Merrill Lynch moved to enforce the agreement and compel
arbitration in the arbitration system of the New York Stock
Exchange.
The district court found no actual bias in the NYSE
arbitral forum. Nonetheless, troubled by a perceived tension
between the federal policies favoring vindication of civil rights
and those favoring arbitration, the court denied the motion to
compel. In a thoughtful opinion, the court based its reasoning on
two grounds: first, that the 1991 Civil Rights Act ("1991 CRA")
amendments to Title VII preclude enforcement of pre-dispute
arbitration agreements concerning discrimination claims, and
second, that the arbitral forum involved, set up by the rules of
the NYSE, was not an adequate forum due to what the district court
called "structural bias." Rosenberg v. Merrill Lynch, Pierce,
Fenner & Smith, Inc., 995 F. Supp. 190, 203, 207 (D. Mass. 1998).
In the end we agree that the motion to compel was
properly denied on the facts of this particular case, but for
reasons different than those advanced by the district court. As to
the first ground relied on by the district court, we hold as a
matter of law that application of pre-dispute arbitration
agreements to federal claims arising under Title VII and the ADEA
is not precluded by the Older Workers Benefit Protection Act
("OWBPA") amendments to the ADEA or by Title VII as amended by the
1991 CRA. As to the second ground, we disavow the district court's
conclusion that the agreement is not enforceable due to "structural
bias" in the NYSE arbitral forum, a conclusion that was based on
errors of law and fact. We agree that there has been no showing of
actual bias in the forum selected and that a refusal to grant a
motion to compel arbitration therefore may not be based on that
ground. 
We nonetheless conclude that there is an independent
ground requiring affirmance of the order denying the motion to
compel arbitration. The parties have agreed that the essential
material facts are undisputed and that this court should, if
necessary, resolve an issue not resolved by the district court: 
whether the parties' agreement met the standard set forth in the
1991 CRA for enforcing arbitration clauses "where appropriate and
to the extent authorized by law." We hold, on the facts presented,
that this standard was not met, and thus that the motion to compel
was properly denied.
I
Rosenberg, whose prior experience had been in accounting
and product engineering, was hired by Merrill Lynch on January 6,
1992. She was forty-five years old and held a Bachelor of Science
degree in accounting. She had no experience in the securities
industry when she entered Merrill Lynch's twenty-four month
training program for financial consultants. 
Rosenberg was required to fill out a standardized
registration form generally required of employees in the securities
industry. That form, the Uniform Application for Securities
Industry Registration or Transfer, commonly referred to as the U-4
Form, included the following language under the heading "THE
APPLICANT MUST READ THE FOLLOWING VERY CAREFULLY":
I agree to arbitrate any dispute, claim or controversy
that may arise between me and my firm, or a customer, or
any other person, that is required to be arbitrated under
the rules, constitutions, or by-laws of the organizations
indicated in Item 10 as may be amended from time to time
and that any arbitration award rendered against me may be
entered as a judgement in any court of competent
jurisdiction.
Item 10 included boxes for various securities organizations and
jurisdictions with which an applicant might be registered. On
Rosenberg's form the boxes marked ASE, CBOE, NASD, NYSE, and MA
were checked -- signifying the American Stock Exchange, Chicago
Board of Exchange, National Association of Securities Dealers, New
York Stock Exchange, and Massachusetts. The ASE, NASD, and NYSE
boxes were apparently checked on or prior to January 10, 1992. The
CBOE and MA boxes were checked sometime between January 10 and
January 24. Rosenberg's supervisor, John Wyllys, signed the form
on January 10, but Rosenberg did not sign the form until January 24
-- although the form was back-dated to January 10. Rosenberg has
no memory of reading or signing the form, although she admits that
the signature is hers, and she says that she did not herself check
any of the boxes. Wyllys in turn certified that Rosenberg would be
familiar with the applicable rules, including the NYSE rules, at
the time of approval of her U-4 Form. That certification was
untrue.
Rosenberg says that she was not given a copy of the
rules, or any amendments to the rules, of the NYSE, the NASD, or
any of the other organizations referred to in Item 10 of the U-4. 
Merrill Lynch does not dispute this claim. 
On May 5, 1992, Rosenberg was given the title of
Financial Consultant, and she worked for Merrill Lynch until May 2,
1994, when her employment was terminated by John Wyllys. The
reason given for the termination was inadequate performance.
Rosenberg alleges that she performed better than at least
four male consultants during her two-year tenure, but that she, and
not any of them, was terminated in mid-1994. She also says that
among those with two years of tenure in her office she was the only
consultant who was over age forty. 
Rosenberg also alleges that on March 9, 1994, a few
months before her termination, John Wyllys sexually harassed her by
activating and handing to her a phallus-shaped vibrator when she
went into his office to obtain a document. (Wyllys denies this and
says the only unusual electrical apparatus in his office was a
"stress buster.") Rosenberg did not file a harassment complaint
internally with Merrill Lynch.
On April 25, 1994 -- allegedly the next time Rosenberg
and Wyllys spoke -- Rosenberg met with Wyllys to discuss her work
performance. Wyllys suggested she tender her resignation, saying
that her work was not up to expected levels. The next day
Rosenberg called Wyllys to invite him to have dinner with her to
discuss his evaluation of her, and he accepted the invitation on
April 27. At dinner, Rosenberg said she would not resign. Her
employment was terminated within days.
II
In July 1994, Rosenberg filed an administrative complaint
with the Massachusetts Commission Against Discrimination ("MCAD")
alleging age and gender discrimination. In October 1995, the MCAD
found no probable cause. One year later, Rosenberg brought suit in
state court asserting discrimination and tort claims against
Merrill Lynch and John Wyllys. The defendants removed the case to
federal court.
Merrill Lynch moved to compel arbitration and to stay the
matter pending arbitration. Merrill Lynch originally moved to
compel arbitration in accordance with the rules of the NASD, which
Merrill Lynch argued required arbitration "of any dispute, claim,
or controversy . . . arising out of the employment or termination
of employment of associated person(s) with any member [of the
NASD]." NASD Manual, Code of Arbitration Procedure Rule 10101
(July 1996). Rosenberg contended that this language was not in
force at the time she signed the U-4, and that the NASD rules in
effect at that time did not apply to employment claims. Merrill
Lynch disputed this, and argued that subsequent modifications of
the rules applied to Rosenberg, given the U-4's reference to rules
that "may be amended from time to time." Merrill Lynch also argued
that regardless of whether the NASD rules required the arbitration
of employment disputes, the NYSE Rules clearly did require
arbitration of Rosenberg's claim. The district court, however,
discussed only the NYSE rules. Merrill Lynch's arguments to this
court have similarly focused on the NYSE rules.
The NYSE rules at the time Rosenberg brought her claim
required arbitration of all employment disputes. Rule 347 stated: 
Any controversy between a registered representative and
any member or member organization arising out of the
employment or termination of employment of such
registered representative by and with such member or
member organization shall be settled by arbitration, at
the instance of any such party, in accordance with the
arbitration procedure prescribed elsewhere in these
rules.

NYSE R. 347. No one explained to Rosenberg that the U-4 Form
agreement to arbitrate that she had signed encompassed employment
disputes she might have with her employer. She was given a copy of
Merrill Lynch's "voluminous" employment handbook, but there is no
argument that the handbook states that employment disputes are to
be arbitrated.
Rosenberg also said in an affidavit that if she had been
informed that her agreement to arbitrate certain claims included
any potential employment discrimination claims she would have
raised questions and might have sought outside advice. Merrill
Lynch responded that the signing of these forms is an absolute
condition of employment, or at least was at that time.
The district court initially issued an opinion deferring
decision on the motion to stay and ordering "additional briefing
and discovery on certain legal issues -- the application of Gilmer[v. Interstate/Johnson Lane Corp., 500 U.S. 20 (1991)] to the
particular statutory schemes at issue here, gender discrimination
and sexual harassment under Title VII, age discrimination under .
. . [the ADEA], the adequacy of the arbitral scheme in the
securities industry to enforce gender and age discrimination
claims, the legal standard for waiver of the right to an Article
III judge and representative jury, and finally, the particular
circumstances of waiver in this case." Rosenberg v. Merrill Lynch,
Pierce, Fenner & Smith, Inc., 965 F. Supp. 190, 192 (D. Mass.
1997).
Later, the district court denied the motion to compel. 
See Rosenberg, 995 F. Supp. at 212. The court attempted to
distinguish the Supreme Court's decision in Gilmer, which had held
valid a pre-dispute arbitration clause in a U-4 Form signed by a
securities industry employee and compelled arbitration of an ADEA
claim. The district court reasoned first that in Title VII, in
contrast to the ADEA, Congress intended to preclude pre-dispute
arbitration clauses, and second, that as a factual matter the NYSE
provided an inadequate arbitral forum to vindicate Rosenberg's
Title VII and ADEA claims. The forum was inadequate, the court
concluded, because of "the extent to which the NYSE arbitration
system is dominated by the securities industry, that is, by the
employment side of this dispute." Id. at 207. The heart of the
court's analysis was its conclusion that there was a close identity
between Merrill Lynch and the NYSE, that the NYSE dominated the
arbitral process, and that the process therefore favored Merrill
Lynch. Specifically, the district court found that the Director of
Arbitration, an employee of the NYSE, appoints the panel of
arbitrators from various pools. Those pools, including the pool of
"public arbitrators," are recommended and appointed by the Chairman
of the NYSE Board. The Director of Arbitration and his staff also
decide some pre-hearing procedural matters. See id. at 210-11. 
The court was concerned with such involvement by NYSE employees,
because it found that "Merrill Lynch . . . helps govern the NYSE." 
Id. at 210. The district court considered that these deficiencies
were not cured by a rule allowing each party to use one peremptory
challenge and unlimited challenges for cause to remove arbitrators
from the panel.
After the district court's decision, Merrill Lynch
abandoned its policy of requiring employees to agree to arbitrate
employment discrimination claims; however, this change in policy
applies only to claims filed after July 1, 1998, and thus not to
Rosenberg. Pursuant to a class action settlement in Cremin v.
Merrill Lynch, Pierce, Fenner & Smith, Inc., No. 96C 3773 (N.D.
Ill. Sept. 2, 1998), Merrill Lynch has agreed that, regardless of
the language of the U-4 Form, employees who file discrimination
claims after July 1, 1998 will be able to bring their claims in
court. Employees with discrimination claims filed before that date
will still be required to submit their claims to arbitration, but
will not be required to do so in the NYSE's arbitration system. 
Instead, arbitrations will be conducted by outside organizations,
before arbitrators who are trained in employment law issues. 
Rosenberg opted out of the settlement, instead choosing to pursue
the case that is before this court. See id.
The NYSE has proposed a rule change that will exclude
employment discrimination claims from the scope of cases to be
arbitrated. See Self-Regulatory Organizations; Notice of Filing of
Proposed Rule Changes by the New York Stock Exchange, Inc. Relating
to Arbitration Rules, 63 Fed. Reg. 52,782 (1998). The SEC has yet
to approve the change, but it recently approved a similar change in
the NASD's rules. See Self-Regulatory Organizations; National
Association of Securities Dealers, Inc.; Order Granting Approval to
Proposed Rule Change Relating to the Arbitration of Employment
Discrimination Claims, 63 Fed. Reg. 35,299 (1998).
Rosenberg argues that the NYSE's proposed rule change
makes this case moot; the defendants say it is not now moot and
will not become moot. Although the rule change may be approved,
the proposed rules are silent as to whether the rule change would
apply retroactively to existing claims. The NASD rule change was
not retroactive. Even if the NYSE rules are changed and those
changes made retroactive and thus Rosenberg cannot be compelled to
arbitrate her claims in the NYSE arbitral forum, Merrill Lynch may
still be able to compel arbitration in one of the other fora listed
on the U-4, including the NASD. This is because the rule change
will alter NYSE Rules 347 and 600 to create an exception for
employment disputes; the rule change has no effect on the U-4 Form. 
The issues in this case would apply with equal force to any attempt
by Merrill Lynch to compel arbitration in the NASD. Thus, the case
is not moot.
III
A. Congressional Intent In Title VII and the OWBPA
1. Title VII and Arbitration Agreements
Title VII of the Civil Rights Act of 1964, as amended by
the 1991 CRA, does not, as a matter of law, prohibit pre-dispute
arbitration agreements, contrary to the holding of the district
court. This is a legal issue which we review de novo. SeeBercovitch v. Baldwin School, Inc., 133 F.3d 141, 147 (1st Cir.
1998).
Whether pre-dispute agreements are prohibited by Title
VII is a question of whether Congress intended to preclude their
use. It is not a question of resolving the lively current public
policy debate about whether use of arbitration, rather than a
court, to resolve claims of employment discrimination hinders or
advances the vindication of basic civil rights. Good arguments
have been made on both sides of this policy debate. The EEOC has
issued a policy statement discouraging the use of pre-dispute
arbitration agreements. See EEOC Notice No. 915.002 (July 10,
1997), reprinted in Excerpts from Text: EEOC Rejects Mandatory
Binding Employment Arbitration, 52 Disp. Resol. J. 11 (1997). Not
surprisingly, supporters of arbitration have criticized the EEOC
statement. See, e.g., Oppenheimer & Johnstone, Con: A Management
Perspective: Mandatory Arbitration Agreements Are An Effective
Alternative to Employment Litigation, 52 Disp. Resol. J. 19, 19-20
(1997).
In Gilmer, the Supreme Court held that the Federal
Arbitration Act ("FAA") required the enforcement of the pre-dispute
mandatory arbitration clause in a U-4 Form identical to the one
signed by Rosenberg. Gilmer involved a claim of age discrimination
brought under the ADEA. The Court, noting numerous other contexts
in which it had held that statutory claims could be the subject of
arbitration agreements, ruled that pre-dispute arbitration clauses
should be enforced unless the plaintiff could show congressional
intent to preclude arbitration. See Gilmer, 500 U.S. at 26. To
determine that intent, courts were directed to look to a statute's
text and legislative history and to ascertain whether there was a
conflict between arbitration and the statute's goals. See id.
We find no conflict between the language or purposes of
Title VII, as amended, and arbitration. The question of
congressional intent in this case is resolved primarily by looking
at the language Congress chose to use in the 1991 CRA, which, at
section 118, provides: 
[w]here appropriate and to the extent authorized by law,
the use of alternative means of dispute resolution,
including . . . arbitration, is encouraged to resolve
disputes arising under the Acts or provisions of Federal
law amended by this title.
Civil Rights Act of 1991, Pub. L. No. 102-166, 118, 105 Stat.
1071, 1081 (1991).
Relying on this language, the district court found that
the language and legislative history of section 118 "unambiguously
reject mandatory arbitration agreements." Rosenberg, 995 F. Supp.
at 201. The court focused on the language "where appropriate and
to the extent authorized by law." The court acknowledged that
Congress passed the 1991 amendments after the Supreme Court's
decision in Gilmer, but noted that the specific language was
drafted prior to the Gilmer decision. The court concluded that the
legislative history of the amendments made clear that "to the
extent authorized by law" referred to the law as it existed prior
to Gilmer, and thus evidenced congressional "intent to preclude
mandatory arbitration." Id. In particular, the court ruled that
Congress had intended the revisions to be consistent with Alexanderv. Gardner-Denver Co., 415 U.S. 36 (1974), in which the Supreme
Court held that an arbitration clause in a collective bargaining
agreement did not preclude an employee from bringing a Title VII
claim in court. See Rosenberg, 995 F. Supp. at 201-04.
In reviewing the district court's legal determination, we
have the benefit of having construed identical language in the
Americans with Disabilities Act ("ADA"), 42 U.S.C. 12101 et seq.(1994). See Bercovitch, 133 F.3d at 150. Compare 42 U.S.C.
12212 (ADA) with 105 Stat. at 1081 (1991 CRA). The district
court apparently did not consider this court's opinion in
Bercovitch, which was decided shortly before the district court
issued its order refusing to compel Rosenberg to arbitrate her
claims. Bercovitch held that a plaintiff could be compelled to
arbitrate claims brought under the ADA "where the plaintiff had
voluntarily signed an agreement requiring arbitration." 
Bercovitch, 133 F.3d at 143. Examining the text of the ADA, we
found that the statute's language, "far from evidencing an
intention to preclude arbitration, can only be interpreted as
favoring it." Id. at 150. Additionally, language in the Committee
Report accompanying the 1991 CRA, cited in Rosenberg's brief as
evidence of congressional intent to preclude mandatory arbitration,
is identical to language in the Committee Report accompanying the
ADA. In Bercovitch, however, we found that the legislative
history of the ADA did not "rebut the presumption in favor of
arbitration" made manifest by the clear language of the statute. 
Id. at 150. We reach the same conclusion here.
Rosenberg and her amici present additional argument that
Congress intended to preclude pre-dispute arbitration agreements in
the Title VII context. For example, Congress rejected a proposed
amendment to the 1991 CRA that would have explicitly permitted pre-
dispute mandatory arbitration agreements, and the majority report
rejecting the proposed amendment stated that "under the [proposed
amendment] employers could refuse to hire workers unless they
signed a binding statement waiving all rights to file Title VII
complaints" in court and declared that "American workers should not
be forced to choose between their jobs and their civil rights." 
H.R. Rep. No. 102-40(I), at 104 (1991), reprinted in 1991
U.S.C.C.A.N. 549, 642. In addition, Rosenberg and her amici point
to a statement that section 118 "contemplates the use of voluntary
arbitration to resolve specific disputes after they have arisen,
not coercive attempts to force employees in advance to forego
statutory rights." 137 Cong. Rec. H9505-01, H9530 (daily ed. Nov.
7, 1991) (statement of Rep. Edwards).
Such statements are insufficient to overcome the
presumption in favor of arbitration which Gilmer establishes. As
other amici note in support of Merrill Lynch, additional statements
by members of Congress expressed the view that section 118 did not
preclude binding arbitration. See 137 Cong. Rec. S15,472-01,
S15,478 (daily ed. Oct. 30, 1991) (statement of Sen. Dole) ("This
provision encourages the use of alternative means of dispute
resolution, including binding arbitration, where the parties
knowingly and voluntarily elect to use these methods. In light of
the litigation crisis facing this country and the increasing
sophistication and reliability of alternatives to litigation, there
is no reason to disfavor the use of such forums."). Congress has
repeatedly rejected legislation that would explicitly bar mandatory
agreements to arbitrate employment discrimination claims. SeeCivil Rights Procedures Protection Act of 1997, H.R. 983, S. 63,
105th Cong. (proposing to revise Title VII and the ADEA to state
that "[n]otwithstanding any Federal statute of general
applicability that would modify any of the powers and procedures
expressly applicable to a claim arising under this title, such
powers and procedures shall be the exclusive powers and procedures
applicable to such claim unless after such claim arises the
claimant voluntarily enters into an agreement to resolve such claim
through arbitration or another procedure"); Civil Rights Procedures
Protection Act of 1996, H.R. 3748, 104th Cong.; Civil Rights
Procedures Protection Act of 1994, H.R. 4981, S. 2405, 103d Cong.
Numerous circuit courts have held that the Supreme
Court's reasoning in Gilmer applies to Title VII claims and that
pre-dispute agreements to arbitrate Title VII claims are
permissible. See, e.g., Seus v. John Nuveen & Co., 146 F.3d 175,
179, 182-83 (3d Cir. 1998), petition for cert. filed, 67 U.S.L.W.
3323 (U.S. Oct 19, 1998) (No. 98-719); Paladino v. Avnet Computer
Techs., Inc., 134 F.3d 1054, 1062 (11th Cir. 1998); Gibson v.
Neighborhood Health Clinics, Inc., 121 F.3d 1126, 1130 (7th Cir.
1997); Patterson v. Tenet Healthcare, Inc., 113 F.3d 832, 837 (8th
Cir. 1997); Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465, 1467-68
(D.C. Cir. 1997); Austin v. Owens-Brockway Glass Container, Inc.,
78 F.3d 875, 882 (4th Cir. 1996); Metz v. Merrill Lynch, Pierce,
Fenner & Smith, Inc., 39 F.3d 1482, 1487 (10th Cir. 1994); Willisv. Dean Witter Reynolds, Inc., 948 F.2d 305, 308, 312 (6th Cir.
1991); Alford v. Dean Witter Reynolds, Inc., 939 F.2d 229, 230 (5th
Cir. 1991). Only the Ninth Circuit has disagreed, as described
below. 
However, few appellate courts, it appears, have dealt
with the precise issue of whether the 1991 CRA demonstrates
congressional intent to ban pre-dispute agreements to arbitrate
employment discrimination claims. In Duffield v. Robertson
Stephens & Co., 144 F.3d 1182 (9th Cir.), cert. denied, 67 U.S.L.W.
3113, 67 U.S.L.W. 3177 (U.S. Nov. 9, 1998) (Nos. 98-237, 98-409)
the court refused to enforce the U-4 Form arbitration clause. The
Duffield court found section 118's statement that arbitration is
encouraged "[w]here appropriate and to the extent authorized by
law" to be ambiguous, and thus looked to the purposes of the 1991
CRA and to legislative history to elucidate the phrase's meaning. 
See id. at 1198. The court concluded that the legislative history,
context, and text of the 1991 CRA demonstrated "that Congress
intended to preclude compulsory arbitration of Title VII claims." 
Id. at 1199.
Two courts have, without discussion, held that the 1991
CRA supports enforcement of pre-dispute agreements to arbitrate
Title VII claims. See Patterson, 113 F.3d at 837 (stating that
"the arbitrability of Title VII claims finds support in the Civil
Rights Act of 1991"); Austin, 78 F.3d at 881 ("The language of the
statutes could not be any more clear in showing Congressional favor
towards arbitration.").
The Third Circuit has interpreted section 118's reference
to "the extent authorized by law" to refer to the Federal
Arbitration Act, not to case law as it stood at the time Congress
drafted the 1991 CRA. See Seus, 146 F.3d at 183 (disagreeing with
Duffield, 144 F.3d at 1194-98). Like this court in Bercovitch, the
Third Circuit first looked to the plain meaning of section 118,
stating that section 118's endorsement of arbitration "simply
cannot be 'interpreted' to mean that the FAA is impliedly repealed
with respect to agreements to arbitrate Title VII and ADEA claims
that will arise in the future." See Seus, 146 F.3d at 182. We
agree.
We hold that neither the language of the statute nor the
legislative history demonstrates an intent in the 1991 CRA to
preclude pre-dispute arbitration agreements. Under Gilmer, the
remaining question is whether "compulsory arbitration of [Title
VII] claims pursuant to arbitration agreements would be
inconsistent with the statutory framework and purposes of" Title
VII. Gilmer, 500 U.S. at 27 (discussing the ADEA). The district
court found that mandatory arbitration would be at odds with the
"structure and purpose" of the 1991 CRA and with the 1991 CRA's
creation of a right to a jury trial for Title VII plaintiffs. 
Rosenberg, 995 F. Supp. at 204-06. 
Resolving this issue requires determining whether there
is any meaningful distinction between Title VII, as amended, and
either the ADEA, which was construed by the Supreme Court in
Gilmer, or the ADA, which was construed by this court in
Bercovitch. Gilmer found no clash between arbitration and the
purposes of the ADEA, noting instead that "[s]o long as the
prospective litigant effectively may vindicate [his or her]
statutory cause of action in the arbitral forum, the statute will
continue to serve both its remedial and deterrent function." 
Gilmer, 500 U.S. at 28 (second alteration in original) (quoting
Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S.
614, 637 (1985)) (internal quotation marks omitted). Bercovitchheld that "[t]here is no reason to think that the ADA presents a
stronger policy case against arbitration than [the] ADEA." 
Bercovitch, 133 F.3d at 150. 
It is difficult to see why the purposes of Title VII
present a stronger case for rejecting arbitration than do the
purposes of either the ADEA or the ADA. In finding that it was
"not plausible . . . that the . . . Act would have . . . undermined
[a plaintiff's private attorney general] role by endorsing private
mandatory pre-dispute arbitration agreements," Rosenberg, 995 F.
Supp. at 205, the district court overlooked Gilmer's statement that
public rights may be enforced through arbitration. The district
court's comment that an endorsement of arbitration would be at odds
with the 1991 CRA's creation of a right to a jury trial, see id. at
205-06, similarly ignores Gilmer's endorsement of arbitration under
the ADEA -- which also provides for jury trials. It may also
evince a distrust of arbitration that the Supreme Court has long
since disavowed. While people may and do reasonably disagree about
whether pre-dispute arbitration agreements are a wise way of
resolving discrimination claims, there is no "inherent conflict"
between the goals of Title VII and the goals of the FAA, as Gilmerused that phrase. Gilmer, 500 U.S. at 26 (quoting
Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 227
(1987)) (internal quotation marks omitted).
The Supreme Court's very recent decision in Wright v.Universal Maritime Service Corp., 119 S. Ct. 391 (1998), reinforces
this conclusion. Wright addressed the issue of waiver of a
judicial forum for ADA claims by virtue of general language in a
collective bargaining agreement ("CBA"). The Court did not reach
the issue of whether a "clear and unmistakable" waiver in a CBA
would be enforced: nor did it take a position on waivers "in areas
outside collective bargaining." Id. at 396-97 & n.2. But nothing
in the opinion suggests that Gilmer is not still good law; rather,
the contrary is true.
2. The OWBPA and Arbitration Agreements
Having found that Congress intended to preclude pre-
dispute arbitration agreements in the 1991 CRA, the district court
did not consider Rosenberg's and amici's argument that the OWBPA
independently and explicitly makes pre-dispute arbitration
agreements inapplicable to age discrimination claims. The district
court apparently felt that Gilmer controlled the issue, stating
only that "Congress has not clearly expressed its intent to
preclude enforcement of pre-dispute arbitration agreements under
the ADEA." Rosenberg, 995 F. Supp. at 206. We agree with the
district court that ADEA claims may be the subject of pre-dispute
arbitration agreements, although the issue cannot be resolved by
reference to Gilmer alone. 
Rosenberg and her amici argue that the OWBPA, which the
district court did not analyze, provides an alternative ground for
upholding the denial of Merrill Lynch's motion to compel
arbitration. Congress enacted the OWBPA in 1990. Although the
Supreme Court decided Gilmer after Congress's passage of the OWBPA,
Gilmer involved a contract signed prior to the OWBPA, and thus did
not consider the effect of the act. Rosenberg signed her U-4 Form
in 1992, well after the OWBPA became effective.
As modified by the OWBPA, the ADEA provides:
(1) An individual may not waive any right or claim under
this chapter unless the waiver is knowing and voluntary. 
Except as provided in paragraph (2), a waiver may not be
considered knowing and voluntary unless at a minimum --
. . . . 
(C) the individual does not waive rights or
claims that may arise after the date the waiver
is executed[.]
29 U.S.C. 626(f)(1). Rosenberg and her amici argue that the
reference to "waiver" should be interpreted to include the U-4
Form's arbitration clause and that the reference to "right[]" should
be interpreted to include the right to a bench or jury trial on
ADEA claims. Amici point to legislative history that suggests that
Congress was particularly concerned about older workers losing the
right to a jury trial for ADEA claims. However, the cited language
speaks only of ensuring that older workers are able to obtain legal
relief and does not mention arbitration or waiver of a judicial
forum. See S. Rep. No. 101-263, at 31-36 (1990), reprinted in 1990
U.S.C.C.A.N. 1509, 1537-1541; H.R. Rep. No. 101-664 (1990),
available in 1990 WL 200383. 
The EEOC as amicus curiae argues that its views on the
OWBPA are entitled to deference. Yet the EEOC's recently issued
rules on the "Waiver of Rights and Claims Under the Age
Discrimination in Employment Act" include no discussion of the
definition of "right" or "claim," see 29 C.F.R. 1625.22
(effective July 6, 1998), and do not say that "waivers" mean
arbitration clauses. We do not defer to views espoused only in the
context of litigation. See Massachusetts v. Blackstone Valley
Elec. Co., 67 F.3d 981, 991 (1st Cir. 1995). This is particularly
true where the agency has gone through rule making and has
conspicuously ignored the topic in its rules. See id. 
Most courts which have considered the issue have
interpreted OWBPA's reference to "any right" to apply to substantive
rights, or, at any rate, not to the right to proceed in court
rather than in arbitration. See, e.g., Seus, 146 F.3d at 181-82;
Williams v. Cigna Fin. Advisors, Inc., 56 F.3d 656, 660-61 (5th
Cir. 1995). Courts that have interpreted the OWBPA to apply to
waivers of substantive rights have relied in part on dicta in
Gilmer commenting that "Congress . . . did not explicitly preclude
arbitration or other nonjudicial resolution of claims, even in its
recent amendments to the ADEA." Gilmer, 500 U.S. at 29; see Seus,
146 F.3d at 181-82; Cigna Fin. Advisors, 56 F.3d at 660-61 ("There
is no indication that Congress intended the OWBPA to affect
agreements to arbitrate employment disputes."). The recent Wrightdecision reaffirms what was said in Gilmer: that an employee's
statutory right to a judicial forum for claims of employment
discrimination "is not a substantive right." Wright, 119 S. Ct. at
396.
Rosenberg and her amici point to the Supreme Court's 
decision in Oubre v. Entergy Operations, Inc., 118 S. Ct. 838
(1998), in which the Court commented that "[t]he OWBPA implements
Congress' policy via a strict, unqualified statutory stricture on
waivers, and we are bound to take Congress at its word." Id. at
841. These comments are not particularly relevant here because
they do not go to the issue of whether the term "waiver" was meant
to apply to pre-dispute arbitration agreements. Indeed, while
Oubre did not consider whether the OWBPA applies to waivers of
procedural as well as substantive rights, the Court did state that
the OWBPA "is clear: An employee 'may not waive' any ADEA claim"
unless the requirements of 626(f) are satisfied. Id. (emphasis
added). To the degree that Oubre has any relevance here, the
reference to "claim" suggests that the waiver provisions refer to
substantive claims. A substantive ADEA claim may be presented in
an arbitral or a judicial forum. See Gilmer, 500 U.S. at 28.
Neither Rosenberg nor amicus curiae the EEOC points to
any court that has held that the OWBPA evinces congressional intent
to preclude pre-dispute arbitration agreements. The EEOC argues
that the Duffield court suggested that the OWBPA reference to
"right[s]" applies to the right to a judicial forum. However, the
Duffield court did not consider the issue, merely commenting that
"current ADEA claims may require different treatment" from those the
Supreme Court considered in Gilmer. See Duffield, 144 F.3d at 1190
n.5.
We hold that Congress did not intend to preclude pre-
dispute arbitration agreements when it enacted the OWBPA. Other
circuits have noted that:
[i]n enacting the OWBPA, Congress' primary concern was
with releases and voluntary separation agreements in
which employees were forced to waive their rights. . . .
[T]he OWBPA protects against the waiver of a right or
claim, not against the waiver of a judicial forum. . . .
We recognize that Congress, through the OWBPA, has
protected terminated employees who waive their
substantive rights under ADEA in exchange for a more
favorable severance package; however, we find no clear
indication that Congress was likewise concerned with
protecting employees who agree to arbitrate claims that
may arise during the course of their employment.
Seus, 146 F.3d at 181 (alterations in original) (quoting Cigna Fin.
Advisors, Inc., 56 F.3d at 660-61) (internal quotation marks
omitted). Nothing in the language or history of the OWBPA shows an
intent impliedly to repeal the FAA for such claims. Congress
certainly may act to preclude arbitration, but its failure to do so
clearly here means there was no such intent. 
To interpret the OWBPA's reference to "right" to include
procedural rights -- and the right to a judicial forum in
particular -- would be to ignore the Supreme Court's repeated
statements that arbitral and judicial fora are both able to give
effect to the policies that underlie legislation. A party who
agrees to arbitrate "does not forgo the substantive rights afforded
by the statute; it only submits to their resolution in an arbitral,
rather than a judicial, forum." Gilmer, 500 U.S. at 26 (quoting
Mitsubishi, 473 U.S. at 628) (internal quotation marks omitted). 
Interpreting the OWBPA to preclude pre-dispute arbitration
agreements would run afoul of the presumption that arbitration
provides a fair and adequate mechanism for enforcing statutory
rights. 
B. The New York Stock Exchange's Arbitration System
In addition to finding that Congress, in enacting the
1991 CRA, had clearly precluded pre-dispute agreements to
arbitrate, the district court found an additional ground for
refusing to compel arbitration: what it described as "structural
bias" in the NYSE's arbitration procedures. The court found that
the NYSE arbitration process was "inadequate to vindicate
Rosenberg's ADEA and Title VII rights." Rosenberg, 995 F. Supp. at
212. In reaching this conclusion, the district court committed two
types of errors. 
First, the district court misinterpreted the window
available post-Gilmer for challenges to a specific arbitral forum. 
The district court found no actual bias in the NYSE's arbitration
system, but nevertheless refused to compel arbitration due to
alleged structural infirmities. Absent a showing of actual bias --
and we agree with the district court that there was no such showing
in this case -- Gilmer required the district court to compel
arbitration. Second, the district court erred in its description
of the NYSE's arbitration procedures. 
In Gilmer, the Court noted that "the NYSE arbitration
rules . . . provide protections against biased panels," and held
that plaintiff Gilmer had not shown actual bias. See Gilmer, 500
U.S. at 30. The Court rejected arguments that arbitration was
inappropriate for ADEA claims due to limitations on discovery and
the lack of written opinions. See id. at 31-32. However, Gilmeralso noted that future plaintiffs might be able to demonstrate
"procedural inadequacies . . . in specific cases." Gilmer, 500
U.S. at 33.
The district court found that "Rosenberg has risen to the
Supreme Court's challenge" to demonstrate that the NYSE arbitration
procedures were inadequate to ensure fair adjudication of her
claims. Rosenberg, 995 F. Supp. at 206. In reaching this
conclusion, however, the district court engaged in a generalized
inquiry of the sort that Gilmer precludes. In particular, the
court found that "the NYSE arbitration system is dominated by the
securities industry." Id. at 207. This conclusion was based on
two findings. First, the district court found that Merrill Lynch
was a member firm of the NYSE, and that the NYSE's member firms
"'govern' the [NYSE] as part of [its] self-regulating scheme." Id. 
The district court explicitly found that there was no
conclusive evidence of bias, either in the manner in which NYSE
arbitrations are conducted or in the makeup of the arbitration
panels. Limited evidence presented in this case suggests that, if
anything, women are more likely to win awards in discrimination
claims brought through arbitration than they are in claims brought
in court. Evidence submitted in this case also shows that in most
discrimination cases brought under the NYSE's arbitration
procedures, at least one of the arbitrators is a woman. The NYSE
has taken a number of steps since the decision in Gilmer --
including training arbitrators in employment law and expanding its
pool of arbitrators -- to make the system fairer than that which
the Gilmer Court endorsed.
Second, the court found that "[f]rom the rules that
govern arbitral procedure, through the selection of the
arbitrators, to the details of discovery practice, the system is
dominated by the NYSE itself." Id. at 210. For instance, "the
Chairman of the Board [of the NYSE] recommends and appoints the
arbitration pools from which individual arbitrators are chosen,
including the pool of non-securities industry 'public'
arbitrators," and the NYSE's Director of Arbitration selects "the
entire initial panel and any replacements." Id. The district
court concluded that "[d]ominance of an arbitral system by one side
in the dispute does not comport with any model of arbitral
impartiality," regardless of the "competence or fairness of
individual arbitrators who participate [in] the NYSE system." Id.at 211.
The district court misinterpreted certain facts regarding
the structure of the NYSE's arbitration system. In particular, the
court mischaracterized both Merrill Lynch's role in the NYSE and
NYSE arbitration procedures. The district court stated that the
majority of NYSE board members were "industry representatives." Id.at 207 n.22. However, representatives of the securities industry
actually occupy a minority of seats on the NYSE's board. In
addition, the NYSE is subject to regulation by the SEC, and such
regulation includes the NYSE's arbitration procedures. The Supreme
Court noted this in Shearson/American Express, Inc. when it
commented that the SEC possesses "expansive power to ensure the
adequacy of the arbitration procedures employed by" self-regulating
organizations such as the NYSE. Shearson/American Express, Inc.,
482 U.S. at 233. Rather than being controlled by the securities
industry, the NYSE plays a significant role in monitoring and
disciplining exchange members for non-compliance with its rules.
The district court also erred in its description of
specific arbitration procedures, including its description of the
pool of potential arbitrators, and in equating the NYSE's
appointment of arbitrators with appointment of arbitrators by a
trade association. For example, arbitrators come from a range of
organizations and backgrounds. In disputes between NYSE members
and non-members, including employment discrimination disputes, "a
majority of [the arbitrators] shall not be from the securities
industry, unless the . . . non-member requests a panel consisting
of at least a majority from the securities industry." NYSE R. 607. 
Additionally, NYSE Rules include a detailed provision prohibiting
persons with industry links from serving as public arbitrators. 
See Guidelines for Classification of Arbitrators, in New York Stock
Exchange Dep't of Arbitration, Arbitration Rules 33, 33 (Sept.
1995). Parties to NYSE arbitrations may exercise one peremptory
challenge or unlimited challenges for cause against arbitrators. 
As Gilmer noted, the NYSE's own rules protect against biased
panels. See Gilmer, 500 U.S. at 30. Panel members are required to
disclose any possible conflicts of interest, and the system is
designed to ensure that no Merrill Lynch employee could serve as an
arbitrator in an employment dispute brought against the company. 
See NYSE R. 610. 
The district court commented that the NYSE "provision for
one peremptory challenge and unlimited challenges for cause . . .
cannot correct the fundamental imbalance in a system in which the
entire initial panel and any replacements are appointed by the
Director of Arbitration." Rosenberg, 995 F. Supp. at 210. 
However, the Director of Arbitration serves the NYSE, not the
securities industry.
Rosenberg's supporting amici argue that the NYSE's
arbitration procedures are inadequate for Title VII claims because
arbitrators often refuse to award statutory attorneys' fees and
because plaintiffs are charged forum fees, which may be as high as
$3,000 per day and tens of thousands of dollars per case. Amici
rely on Cole, in which the court held that arbitration agreements
requiring plaintiffs to pay forum fees in order to vindicate
statutory rights are impermissible. See Cole, 105 F.3d at 1484-85. 
There are three responses. First, that arbitrators may
sometimes do undesirable things in individual cases does not mean
the arbitral system is structurally inadequate. Nothing in the
choice of arbitration mandates these outcomes, nor are such
outcomes necessary concomitants of the NYSE arbitral system. The
NYSE rules do not limit available relief. Rule 627 provides that
arbitrators may award "damages and/or other relief." NYSE R.
627(e); see also Gilmer, 500 U.S. at 32. 
The second is that it does not appear to be the usual
situation that a plaintiff is asked to bear forum fees. Amici in
support of Rosenberg cite arbitration decisions in which plaintiffs
have been required to pay costs. Merrill Lynch replies that the
record does not support this claim: in the thirty-three arbitration
cases Rosenberg placed in the record, only one plaintiff who
prevailed on statutory grounds was denied fees and costs. NYSE
arbitrators possess discretion to award costs and fees when they
decide a dispute. Cf. Gilmer, 500 U.S. at 32 (stating that "the
NYSE rules applicable here do not restrict the types of relief an
arbitrator may award"); Uniform Code of Arbitration 30, inSecurities Industry Conference on Arbitration Report #9, at 7, 22-
24 (June 1996); Securities Indus. Conference on Arbitration, The
Arbitrator's Manual 29 (Oct. 1996) (stating that "[g]enerally,
parties to an arbitration are responsible for their personal costs
associated with bringing or defending an arbitration action," but
noting that exceptions exist, including where there is a statutory
basis for attorneys' fees); id. at 30 (stating that although forum
fees are required, they may be waived); see also Kuehner v.
Dickinson & Co., 84 F.3d 316, 320 (9th Cir. 1996) (stating that
securities arbitrators "have the full power to provide the legal
and equitable remedies available" under statutes). Indeed, in Colethe D.C. Circuit enforced an arbitration agreement in part because"under NYSE rules and NASD rules, it is standard practice in the
securities industry for employers to pay all of the arbitrators'
fees. . . . [I]n Gilmer, the Supreme Court endorsed a system of
arbitration in which employees are not required to pay for the
arbitrator assigned to hear their statutory claims." Cole, 105
F.3d at 1483-84.
Third, if unreasonable fees were to be imposed on a
particular employee, the argument that this was inconsistent with
the 1991 CRA could be presented by the employee to the reviewing
court. Cf. Cole, 105 F.3d at 1485. That issue is not presented by
this case. As Gilmer said, "'although judicial scrutiny of
arbitration awards necessarily is limited, such review is
sufficient to ensure that arbitrators comply with the requirements
of the statute' at issue." Gilmer, 500 U.S. at 32 n.4 (quoting
Shearson/American Express, Inc., 482 U.S. at 232).
Contrary to Rosenberg's arguments, arbitration is often
far more affordable to plaintiffs and defendants alike than is
pursuing a claim in court. Cf. Gilmer, 500 U.S. at 31 (noting that
although arbitration discovery "procedures might not be as
extensive as in the federal courts, by agreeing to arbitrate, a
party 'trades the procedures and opportunity for review of the
courtroom for the simplicity, informality, and expedition of
arbitration'" (quoting Mitsubishi, 473 U.S. at 628)).
Gilmer does not mandate enforcement of all arbitration
agreements. Plaintiffs are not required to take their claims to
biased panels or through biased procedures. But the evidence here
establishes no basis to invalidate the NYSE arbitral scheme. 
IV
The district court did not reach Rosenberg's arguments
that her particular U-4 Form arbitration clause was unenforceable
because the contract was an unconscionable adhesion contract, or
because her signing of the agreement was not knowing and voluntary
or otherwise not within the scope of Congress's intention. SeeRosenberg, 995 F. Supp. at 212. Rosenberg renews these arguments
on appeal. The parties agree that all material facts are before
this court and that we should resolve the issue if we reach it. 
This court possesses the discretion to resolve these issues, as the
parties have had a full opportunity to present their arguments to
the district court. See New Hampshire Motor Transp. Ass'n v.
Flynn, 751 F.2d 43, 52 (1st Cir. 1984). We reject Rosenberg's
argument that the U-4 Form was an unconscionable contract of
adhesion. However, on the specific facts presented and under the
language of the 1991 CRA, we hold that Rosenberg cannot be
compelled to arbitrate her employment discrimination claims against
Merrill Lynch. Our resolution of this case has no bearing
whatsoever on the enforceability of agreements to arbitrate
consumer disputes. In addition, nothing in this opinion concerns
the enforceability of provisions of the U-4 Form or the NYSE Rules
not related to the arbitration of employment discrimination
disputes.
A. Was Rosenberg's Agreement to Arbitrate Invalid
Because It Was An Unconscionable Contract of
Adhesion?

Rosenberg and amici argue that the arbitration agreement
should not be enforced because it is unconscionable and because it
is the result of a gross disparity of bargaining power. We reject
these arguments, which are not frivolous, because the law has long
imposed a heavy burden on those who make such arguments and
Rosenberg has not met her burden of proof.
The district court found that signing the U-4 Form was a
prerequisite for employment as a securities broker, and Merrill
Lynch has acknowledged that it would not "employ or promote
financial consultants who refuse to sign the Form U-4." Securities
industry officials similarly confirmed that financial consultants
were not permitted to excise the arbitration clause from the U-4
Form. Rosenberg argues that the imposition of such a requirement
renders the U-4 Form arbitration clause invalid as an unenforceable
contract of adhesion. 
We agree with the Third Circuit that the U-4 Form
arbitration clause is not unenforceable on these grounds. SeeSeus, 146 F.3d at 184. In Seus, the court found that even if the
U-4 Form arbitration agreement were a contract of adhesion
plaintiff would still need to show "both a lack of meaningful
choice about whether to accept the provision in question, and that
the disputed provisions were so onesided as to be oppressive." Id.(quoting Stebok v. American Gen. Life & Accident Ins. Co., 715 F.
Supp. 711, 714 (W.D. Pa.), aff'd, 888 F.2d 1382 (3d Cir. 1989))
(internal quotation marks omitted). And section 211 of the
Restatement (Second) of Contracts states that a term in a
standardized agreement is enforceable unless one party "has reason
to believe that the party manifesting . . . assent would not do so
if he knew that the writing contained a particular term." 
Restatement (Second) of Contracts 211 (1979); see also Waters v.
Min Ltd., 587 N.E.2d 231, 233 (Mass. 1992) ("Unconscionability must
be determined on a case-by-case basis, with particular attention to
whether the challenged provision could result in oppression and
unfair surprise to the disadvantaged party and not to allocation of
risk because of 'superior bargaining power.'" (quoting Zapatha v.
Dairy Mart, Inc., 408 N.E.2d 1370, 1375 (Mass. 1980))). Rosenberg
has made no such showing.
In addition, in Gilmer, the Court stated that inequality
in bargaining power "is not a sufficient reason to hold that
arbitration agreements are never enforceable in the employment
context." Gilmer, 500 U.S. at 33. Gilmer, after all, involved the
same U-4 Form arbitration clause at issue here. Absent a showing
of fraud or oppressive conduct -- which Rosenberg does not allege
occurred -- the contract is not unenforceable on these grounds. 
B. Was Rosenberg's Agreement to Arbitrate
Appropriate and Authorized By Law Within the
Meaning of the 1991 CRA?
We repeat what Rosenberg's U-4 Form said and did not say. 
The U-4 Form stated that Rosenberg agreed to arbitrate "any
dispute, claim or controversy that may arise . . . that is required
to be arbitrated under the rules, constitutions, or by-laws of the
organizations indicated in Item 10" (emphasis added). The
agreement did not state that Rosenberg agreed to arbitrate alldisputes, or even any dispute. The agreement only required
Rosenberg to arbitrate any dispute that the NYSE's rules,
constitution, or bylaws (or those of any of the organizations
listed in item 10) required to be arbitrated. Cf. Prudential Ins.
Co. of America v. Lai, 42 F.3d 1299, 1302 (9th Cir. 1994) (noting
that the U-4 Form arbitration provision "does not in and of itself
bind appellants to arbitrate any particular dispute"). It is
undisputed that Rosenberg's execution of this provision was a
condition of her employment with Merrill Lynch.
The NYSE Rules in turn required Rosenberg to arbitrate
"[a]ny controversy . . . arising out of [her] employment or
termination of [her] employment." NYSE R. 347. Merrill Lynch does
not dispute Rosenberg's statement that she never received a copy of
the NYSE rules and has provided no evidence that it gave her a copy
or made one available to Rosenberg at the time of the employment,
at the time of NYSE approval, or even later. Nor has Merrill Lynch
provided evidence it even told Rosenberg that the clause required
her to arbitrate any employment discrimination claims. Had the U-4
provided for arbitration of all disputes, or given explicit notice
that employment disputes were subject to arbitration, we would have
had little difficulty in finding that Rosenberg had agreed to
arbitrate her employment discrimination claims within the meaning
of the 1991 CRA.
For purposes of the 1991 CRA, the parties and the
district court have adopted the analytical rubric of whether the
agreement was "knowing and voluntary" to examine the agreement. 
This usage is common, see, e.g., Bercovitch, 133 F.3d at 151
(dicta), and stems from a footnote in Gardner-Denver:
In determining the effectiveness of any such waiver, a
court would have to determine at the outset that the
employee's consent . . . was voluntary and knowing.

Gardner-Denver, 415 U.S. at 52 n.15.

The "knowing and voluntary" language undoubtedly comes
from thinking of arbitration as "a waiver of judicial remedies."
Mitsubishi, 473 U.S. at 628 (emphasis added). It is commonplace
that waivers of certain rights, particularly substantive rights,
are enforceable only if they are knowing and voluntary. Whether a
standard similar to the one that applies to rights such as the
right to counsel, cf. Johnson v. Zerbst, 304 U.S. 458, 465 (1938),
should apply to waivers of a judicial forum is an open question.
As the Seventh Circuit has noted, if this "knowing and
voluntary" standard is meant to add another layer of protection for
the employee, then it is "[l]ess clear . . . whether the right to
have one's federal claims determined judicially rather than in an
arbitration proceeding qualifies for this added protection." 
Gibson, 121 F.3d at 1129. On this issue of whether there is a
heightened level of protection the circuits are split. The Supreme
Court has not directly decided the issue.
The Ninth Circuit has expressly adopted a "knowing"
standard for such arbitration clauses and has described the
standard as being a heightened one. See Renteria v. Prudential
Ins. Co. of America, 113 F.3d 1104, 1105-06 (9th Cir. 1997); Lai,
42 F.3d at 1305. The Third Circuit has rejected any heightened
standard. See Seus, 146 F.3d at 183-84 & n.2. The Eighth Circuit
appears to have done the same in Patterson. See Patterson, 113
F.3d at 838. The Seventh Circuit recognized the issue in Gibson,
but found it unnecessary to resolve it. Gibson, 121 F.3d at 1130. 
We also find it unnecessary to resolve this general
issue. Rather, we focus on the language of the 1991 CRA, in which
the terms "knowing and voluntary" do not appear. The operative
language is:
[w]here appropriate and to the extent authorized by law,
. . . arbitration . . . is encouraged to resolve disputes
arising under [these laws].

1991 CRA 118, 105 Stat. at 1081. There has been little case law
on the meaning of these terms.
At a minimum the words "to the extent authorized by law"
must mean that arbitration agreements that are unenforceable under
the FAA are also unenforceable when applied to claims under Title
VII and the ADEA. Under the FAA, arbitration agreements are
enforceable "save upon such grounds as exist at law or in equity
for the revocation of any contract." 9 U.S.C. 2. In Mitsubishi,
the Court gave an example of the sorts of agreements which are
unenforceable under the FAA:
Of course, courts should remain attuned to well-supported
claims that the agreement to arbitrate resulted from the
sort of fraud or overwhelming economic power that would
provide grounds "for the revocation of any contract."

Mitsubishi, 473 U.S. at 627 (quoting 9 U.S.C. 2). The question
under the FAA of whether an arbitration agreement is enforceable is
generally determined by reference to common-law principles of
general applicability. See Perry v. Thomas, 482 U.S. 483, 492 n.9
(1987); Southland Corp. v. Keating, 465 U.S. 1, 19-20 (1984). When
deciding whether the parties agreed under the FAA to arbitrate a
certain matter, courts "generally . . . should apply ordinary
state-law principles that govern the formation of contracts." 
First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944
(1995).
Similarly, the question of the scope of an arbitration
agreement under the FAA is a matter not just of state law, but of
general federal arbitration law. See Moses H. Cone Mem'l Hosp. v.
Mercury Constr. Corp., 460 U.S. 1, 24 (1983). There is often, as
here, a predecessor question of whether there was an agreement at
all to arbitrate. See MCI Telecomms. Corp. v. Exalon Indus., Inc.,
138 F.3d 426, 428-29 (1st Cir. 1998). Reference should be made to
standard principles of contract law in making such a determination. 
See id. at 429-30. We need not resolve here whether the "to the
extent authorized by law" clause has a meaning greater than a
reference to the FAA.
While such principles provide background, the resolution
of the case does not turn on them but on the language of the 1991
CRA; that is, whether under these facts, the arbitration clause was
"appropriate." Thus, this case does not implicate any broader
questions of enforceability of the arbitration clause when the 1991
CRA or ADEA are not involved.
We set the context. Rosenberg's and Merrill Lynch's
arbitration agreement did not by itself define the range of claims
subject to arbitration, even though Merrill Lynch expressly
represented that she would be advised of the rules. It referred
only to arbitration of such claims as were required to be
arbitrated by the NYSE rules. But those rules were not given to
Rosenberg or described to her. The question then becomes which
party should bear the risk of her ignorance. Given Congress's
concern that agreements to arbitrate employment discrimination
claims should be enforced only where "appropriate," a concern not
expressed in the FAA or at common law, Merrill Lynch should, we
believe, bear that risk.
As part of its employment agreement with Rosenberg,
Merrill Lynch required her to agree to the terms of the U-4 Form. 
The U-4 Form, prepared under the NYSE Rules, requires that
employees being asked to execute the U-4 Form be given a copy of
the NYSE rules or information to the same effect, at least by the
time of approval. The U-4 Form thus explicitly contemplated that
Merrill Lynch would take the steps necessary to ensure that
Rosenberg was aware of the NYSE rules. The same U-4 Form that
Rosenberg signed to register with the NYSE was also signed by John
Wyllys on behalf of Merrill Lynch. Under the heading, "THE FIRM
MUST COMPLETE THE FOLLOWING," the U-4 Form stated:
To the best of my knowledge and belief, the applicant is
currently bonded where required, and, at the time of
approval, will be familiar with the statute(s),
constitutions(s), rules and by-laws of the agency,
jurisdiction or self-regulatory organization with which
this application is being filed, and the rules governing
registered persons, and will be fully qualified for the
position for which application is being made herein.

Wyllys' signature follows this statement. But Wyllys'
certification was false: Merrill Lynch never provided Rosenberg
with a copy of the rules and Merrill Lynch has provided no
evidence it made Rosenberg familiar with the rules as to
arbitration. Merrill Lynch's failure runs afoul of the mutual
understandings. Since the arbitration requirement stems from the
NYSE Rules and the U-4 Form requires that the employee be
"familiar with" the rules and thus with the requirement for
arbitration of employment claims, we think that Merrill Lynch's
inaction undercuts the imposition of an arbitration requirement. 
See Dickstein v. duPont, 443 F.2d 783, 784 (1st Cir. 1971)
(stating that the predecessor to the U-4 Form "was an integral and
mutually binding part of [the] employment arrangement" between an
employee and a NYSE brokerage house). The NYSE rules contemplated
that Merrill Lynch certify to it that, at least as of the time of
NYSE approval of Rosenberg's application, Rosenberg be "familiar"
with the rules including the rules that all employment disputes
be arbitrated. Merrill Lynch's failure, we believe, makes it
inappropriate to enforce the provision.
This holding is in accordance with Ramirez-De-Arellanov. American Airlines, Inc., 133 F.3d 89 (1st Cir. 1997), an
employee handbook case in which this court suggested that an
agreement to "waive the right to a judicial forum for civil rights
claims, . . . in exchange for employment or continued employment,
must at least be express." Id. at 91 n.2 (quoting Nelson v.
Cyprus Bagdad Copper Corp., 119 F.3d 756, 761-62 (9th Cir. 1997),
cert. denied 118 S. Ct. 1511 (1998)) (internal quotation marks
omitted); see also Paladino, 134 F.3d at 1059, 1062 (refusing to
enforce the arbitration of Title VII claims, one judge on the
ground that the language of the arbitration clause did not provide
fair notice, and two judges on the ground that the clause
foreclosed Title VII remedies and may have required the claimant
to bear hefty arbitration fees).
In short, under these circumstances, compelling
arbitration would not be "appropriate" under the 1991 CRA. Our
approach is close to that taken by the Supreme Court in Wright. 
There the court declined to mandate arbitration of an ADA claim
where the waiver of a judicial forum set forth in a CBA was not
"clear and unmistakable." Wright, 119 S. Ct. at 396-97. To be
sure, Wright carefully distinguished a private arbitration
agreement from an agreement in the collective bargaining context. 
See id. at 397 n.2. There are sound reasons to recognize such a
distinction and a lesser standard than "clear and unmistakable"
applies to private agreements. See id. at 396. But Wright also
teaches that the "appropriate" language of the 1991 CRA, which
parallels that of the ADA, has some teeth:
Our conclusion that a union waiver of employee rights
to a federal judicial forum for employment
discrimination claims must be clear and unmistakable
means that, absent a clear waiver, it is not
'appropriate' . . . to find an agreement to arbitrate.

Id. at 397 n.2. In recognizing that "the right to a federal
judicial forum is of sufficient importance to be protected," id.at 396, Wright leads to the conclusion, we think, that there be
some minimal level of notice to the employee that statutory claims
are subject to arbitration.
V
This case requires applying the Supreme Court's holding
in Gilmer to Title VII as amended by the 1991 CRA and the ADEA as
amended by the OWBPA. This case does not involve evaluation of
the policies in favor of and against litigation as opposed to
arbitration. We hold that there was no congressional intent to
preclude pre-dispute arbitration agreements manifested in the 1991
CRA or the OWBPA. We also hold that the evidence does not support
a finding that there is "structural bias" or that the NYSE arbitral
rules create "procedural inadequacies" sufficient to be an
exception to Gilmer. Our holding here that Rosenberg cannot be
compelled to arbitrate her claims is limited. As stated above,
had Merrill Lynch taken the modest effort required to make
relevant information regarding the arbitrability of employment
disputes available to Rosenberg as it committed itself to do, it
would have been able to compel Rosenberg to arbitration. This
case does not concern the enforceability of Form U-4 arbitration
agreements with customers. Nor does it concern the enforceability
of employment disputes where the claims involved are not
employment discrimination claims under the federal civil rights
laws.
Affirmed. Costs to Rosenberg.

- Opinion concurring in part and dissenting in part follows -

WELLFORD, Senior Circuit Judge, concurring in part and
dissenting in part. I concur entirely with Judge Lynch's
excellent analysis of the issues in this case and in her opinion
on those issues set out in Parts I, II and III, which reverse the
decision of the district court. Furthermore, I concur in Part IVA
of Judge Lynch's analysis concerning whether the contract involved
was an unenforceable, "unconscionable adhesion contract." 
Rosenberg's agreement to arbitrate was not invalid, and this case
is not moot.
In general, I concur with the conclusion that Gilmer v.
Interstate/Johnson Lane Corp., 500 U.S. 20 (1991), is still good
law and applies to the issues in this controversy. The rationale
of Bercovitch v. Baldwin School, Inc., 133 F.3d 141 (1st Cir.
1998), is also persuasive on the claims presented by Rosenberg,
as is Seus v. John Nuveen & Co., 146 F.3d 175 (3d Cir. 1998). Seealso Patterson v. Tenet Healthcare, Inc., 113 F.3d 832 (8th Cir.
1997). I also agree with the rejection of Duffield v. Robertson
Stephens & Co., 144 F.3d 1182 (9th Cir.), cert. denied, 119 S.Ct.
445 (Nov. 9, 1998), as unpersuasive. I would, in short, like
Judge Lynch, reject the reasoning of the district court in this
case.
I write separately, however, in respectful disagreement
with the conclusions in Part IVB. The analysis concerning non-
enforcement of the parties' agreement, because not "appropriate
and authorized by law" under CRA, is my point of departure in this
difficult case.
There are a number of facts that cut against the result
reached by Judge Lynch's opinion. First, the district court found
Rosenberg to be a mature, well-educated businesswoman when she
began her career as a financial consultant with Merrill Lynch. 
Second, discovery in this case was not even completed before
defendant moved to compel arbitration under the U-4 agreement and
applicable exchange/securities rules. Third, in denying the
motion, the district court found that Rosenberg signed the
agreement, but allegedly did not receive any applicable exchange
rules. She asserted that she was not advised of, and was ignorant
about, the arbitration documents. The district court, however,
makes no reference to Merrill Lynch's position vis-a-visfurnishing advice, documentation, or information to Rosenberg at
or before--or after--Rosenberg signed the agreement to arbitrate. 
Judge Lynch notes that Merrill Lynch "does not dispute" that
Rosenberg was not given a copy of applicable rules of any
organization referred to in Item 10 of U-4, but I do not conclude
from the available record that Merrill Lynch concedes that a copy
of the rules was not available to her at all pertinent times upon
request. Nowhere in the record do I find a contention that
Rosenberg asked about such rules or sought advice or information
from Merrill Lynch about the meaning and effect of the U-4
agreement which she signed. We do not know what, if anything,
Merrill Lynch's representatives did, said or furnished Rosenberg
in connection with the arbitration agreement, and/or in response
to any inquiry or actions of Rosenberg regarding the said
agreement.
I would find the arbitration clause in question not to
be "inappropriate" as to the issues in this case. Congress, in
using the expression "[w]here [arbitration is] appropriate" may
well have intended some threshold determination that the type of
employee-employer dispute be amenable to resolution by
arbitration. The Supreme Court in Wright v. Universal Maritime
Serv. Corp., 119 S.Ct. 391 (1998), interpreted the "[w]here
appropriate and to the extent authorized by law" language of the
Civil Rights Act as a single unit in deciding that a collective
bargaining agreement negotiated by a union would not be enforced
against an affected employee under the circumstances of that case. 
That situation was different from the private employee-employer
agreement here involved. Wright limited its holding to the
context where a labor union waived a member's federal statutory
rights.
The form signed by Rosenberg indicated an agreement to
arbitrate and directed her to read the agreement carefully with
specific reference to New York Stock Exchange Rules. Under all
the circumstances, I would be inclined to remand to the district
court to develop fully the facts as to whether Rosenberg was
afforded a reasonable opportunity to appreciate the arbitration
implications of her employment agreement. Did she have an
opportunity to be familiar, or did she have a duty to familiarize
herself, with the arbitration undertaking?
I do not consider Ramirez-De-Arellano v. American
Airlines, Inc., 133 F.3d 89 (1st Cir. 1997), to support the
majority view. Ramirez was an action "brought primarily under the
Fair Labor Standards Act (FLSA) and Puerto Rico law." Id. at 89. 
It did not involve a civil rights claim, and the court upheld
summary judgment for defendant in the discharge of plaintiff. The
Ramirez court simply held that plaintiff could pursue his action
in federal court because of the court's dissatisfaction with
aspects of American Airlines' arbitration procedures not akin to
those involved in the instant dispute.
More important, however, is my disagreement with Judge
Lynch's conclusion in part IVB that arbitration would not be
"appropriate" because, as plaintiff avers, Merrill Lynch did not
furnish Rosenberg with a copy of the pertinent rules, and because
Merrill Lynch falsely certified that Rosenberg was "familiar with"
the rules. 
I am reluctant to join a finding that Merrill Lynch,
and/or its representative, John Wyllys, falsely certified
Rosenberg's qualifications, fitness, and knowledge as a financial
representative and her familiarity with the rules. Even assuming,
however, that the certification was incorrect, I disagree with the
conclusion reached in Part IVB. 
Unlike Judge Lynch, I would hold that Rosenberg was
presumed to understand, and to be bound by, the plain terms of her
U-4 agreement even if she were not furnished copies of the
exchange rules at the time of signing. I believe the agreement
was broad and plain and that it put Rosenberg on notice that she
agreed to arbitrate at the outset "any dispute, claim or
controversy" with Merrill Lynch under exchange rules. If she
"did not make herself aware of the existence or scope of [the
arbitration] clause [in the U-4 agreement], she did so at her own
peril." Beauchamp v. Great West Life Ins. Co., 918 F.Supp. 1091,
1099 (E.D. Mich. 1996). She is "presumed to know the contents of
the signed agreement" as well as its reasonable import. Creminv. Merrill Lynch Pierce, 957 F.Supp. 1460, 1477 (N.D. Ill. 1997)
(citing Beauchamp, 918 F.Supp. at 1097-98).
Ludwig v. Equitable Life Assurance Society of the U.S.,
978 F.Supp. 1379, 1382 (D.Kansas 1997), puts it even more
specifically under facts and contentions similar to those in this
case: "regardless of whether plaintiff received the NASD Code,
the potential breadth of the arbitration provision immediately put
her on notice that any and all employment disputes were subject
to mandatory arbitration." Id. at 1382; see also Herko v.
Metropolitan Life Ins. Co., 978 F.Supp. 141, 147 (W.D. N.Y. 1997).
All these district court cases cited herein involve
agreements and contentions by plaintiffs similar to those made in
this case by Rosenberg. I would hold to the presumption, in light
of these authorities, that Rosenberg was put on notice and should
have made prompt inquiry in connection with her executing the
arbitration agreement as to the scope and nature of the exchange
rules.
I would therefore REVERSE and grant the defendant's
motion for arbitration.