MCI TELECOMMUNICATIONS
CORP., Plaintiff, Appellee,

v.

EXALON INDUSTRIES, INC.,
Defendant, Appellant.

No. 97–1735.

United States Court of Appeals,
First Circuit.

Heard Jan. 5, 1998.

March 11, 1998.

R. Daniel Prentiss, with whom Brenda E. Mezich–Carcieri and McGovern, Noel & Benik were on brief for appellant.

Mark A. Berthiaume, with whom Louis J. Scerra, Jr., Nancy A. Kopans and Goldstein & Manello, P.C. were on brief for appellee.

Before TORRUELLA, Chief Judge, CAMPBELL, Senior Circuit Judge, and LYNCH, Circuit Judge.

TORRUELLA, Chief Judge.

This appeal requires us to determine whether defendant-appellant Exalon Industries, Inc. ("Exalon") is bound by an arbitration award rendered in favor of plaintiff-appellee MCI Telecommunications Corp. ("MCI"), pursuant to the provisions of a tariff regulation filed by MCI with the Federal Communications Commission. Under certain circumstances, this tariff allows for the arbitration of disputes between MCI and those using its services as provider of long-distance and interstate telecommunications.

Exalon is an alarm company that engages in telemarketing to promote its services and for these purposes makes extensive use of interstate telecommunications. In 1991, it entered into a written contract with MCI for telecommunication services. This contract may have been terminated in 1992.[1] Sometime thereafter, Exalon and MCI agreed to establish a new arrangement between them, and thus MCI began once again to provide telecommunication services to Exalon. Upon receipt of MCI's first bill, however, Exalon contested the amount due under bill on the basis that MCI had failed to provide the services according to the terms to which the parties had agreed. This dispute was not resolved through negotiation and Exalon indicated to MCI that it was cancelling their relationship. Thereafter, in June of 1995, MCI invoked the arbitration provisions contained in the aforementioned tariff that it had filed with the FCC.[2]

---

1. In an affidavit filed by Exalon before the magistrate judge, Exalon's vice-president for finance from 1987 through 1996 stated that Exalon entered into a contract with MCI on August 15, 1991, which was "terminated in 1993." She then indicated that Exalon thereafter entered into a contract with a third party for the provision of telecommunications services, which lasted until April 29, 1993, when MCI again solicited Exalon's business. Negotiations resulted in MCI starting to provide services again to Exalon "in or about July, 1994." There was no written agreement regarding this more recent relationship.

The magistrate judge stated in the Report and Recommendation, somewhat equivocally, that:

[a]s far as the Court can gather from what has been submitted, in July of 1991 the parties contracted for sale of MCI telecommunications services. Exalon enrolled in MCI's 'VIP plan' from August 15, 1991 thr[ough] August 15, 1992. Plaintiff's Ex. A. This initial contract incorporates by reference the 'MCI Tariff FCC No.1' (hereinafter 'the tariff').... Beyond this initial contract, the factual averments lose their clarity. MCI claims that this contractual relationship continued uninterrupted, through various accounts, until May of 1995. However, the only complete contract provided to the Court is the initial one encompassing the one-year period beginning August 15, 1991.... By whatever means, the two parties conducted business with each other until November 7, 1994, when Exalon sent a letter to MCI in an attempt to sever the relationship....

As will be discussed *post*, the lacuna in the magistrate judge's findings—the failure to determine that there was in effect a written agreement to arbitrate covering the dispute subject of this appeal, or if this "be in issue," the failure "to proceed summarily to trial thereof" to determine whether there was such a written arbitration contract binding on the parties—prevents us from affirming the district court's judgment confirming the arbitral award. *See* 9 U.S.C. § 4.

2. The arbitration provision, contained in Tariff F.C.C. No. 1 section 7, provides in pertinent part:

.13 *Arbitration of Disputes:* All disputes concerning or affecting payment of invoices issued after February 28, 1994 for charges totaling $10,000 and above may be resolved through binding arbitration.... Once MCI or the customer has commenced arbitration of a dispute, arbitration shall be mandatory, and counterclaims may be asserted.... As a condition of service under this tariff, claims and counterclaims arbitrated under these Rules shall be governed by the law and remedies provided by these Rules....

.132 *Commencement of Arbitration:* The customer or MCI may commence arbitration by serving a written Notice of Claim on the other party....

.1327 *Answer:* Within 17 days after the date of commencement of arbitration, the Responding Party shall serve a written Answer on the Claiming Party....

.13271 *Failure to Respond:* An award will be entered, without a hearing, against a Responding Party who fails to serve an Answer to a Notice of Claim within 17 days after the date of commencement of arbitration, unless the arbitrator finds that the party's failure to respond was excusable....

.1383 *Final and Binding:* Seven days after the date of issuance of an award as to which no correction is requested or made, the award shall be final and binding on the parties....

.1385 *Enforcement of the Award:* Judgment may be entered upon an award in federal or

**428**

An arbitrator was appointed and a hearing scheduled for July 10, 1995. Exalon failed to respond to the notice, and on August 29, 1995, the arbitrator rendered an award in favor of MCI in the amount of $88,233.24. Exalon did not request that the arbitrator vacate, modify, or correct the award.

On August 28, 1996, MCI filed an action to enforce the arbitration award in the United States District Court for Rhode Island. Exalon responded, denying the existence of a valid arbitration award. In support of this contention, it argued that no written agreement existed between the parties binding them to arbitrate the controversy. Exalon thus claimed that the arbitration award was invalid and unenforceable.

Predictably, MCI countered that Exalon was bound by the mandatory arbitration provisions of the tariff, which was in writing and of which, it was argued, Exalon was presumed by law to have knowledge. Among other things, the tariff provides that "an award will be entered, without a hearing, against a Responding Party who fails to serve an Answer to a Notice of Claim within 17 days after the date of commencement of arbitration." MCI Tariff F.C.C. No. 1, § 7.13271. Since Exalon failed to participate in the arbitration proceedings, MCI argued that Exalon was bound by the award entered against it. MCI also argued that, in any case, Exalon's failure to challenge the award within three months after it was filed or rendered barred it from contesting its validity before the district court. MCI's contention was grounded in the provisions of section 12 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., which states that a "[n]otice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered." 9 U.S.C. § 12.

Exalon filed a motion for judgment on the pleadings which was heard before a U.S. magistrate judge. After a hearing, the magistrate judge recommended that Exalon's motion be denied and that the award be confirmed, on the basis that Exalon had waived any objections it might have had to arbitration by failing to appear before the arbitrator. The district court adopted the report of the magistrate judge and entered an order and judgment confirming the arbitration award. This appeal ensued.

The issues presented by this appeal concern questions of law and are therefore subject to de novo review. See Keystone Shipping Co. v. New England Power Co., 109 F.3d 46, 50 (1st Cir.1997). "[C]ourts of appeal should apply ordinary, not special, standards when reviewing district court decisions upholding arbitration awards." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 948, 115 S.Ct. 1920, 1926, 131 L.Ed.2d 985 (1995).

Although national policy favors the resolution of controversies through arbitration, see Southland Corp. v. Keating, 465 U.S. 1, 10, 104 S.Ct. 852, 858, 79 L.Ed.2d 1 (1984), submission of disputes to this type of forum is totally dependent on the private will of the parties as embodied in whatever contract they may have entered into. See First Options, 514 U.S. at 943, 115 S.Ct. at 1923–24 ("Arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration."). Stated otherwise, there is no general legal duty to arbitrate private commercial disputes; instead, such proceedings are strictly the product of voluntary contrac-

state court. The United States Arbitration Act, sections 9 through 23, ..., shall govern all proceedings to confirm, modify, or vacate an award....

We note in passing that the arbitration provisions contained in MCI Tariff FCC No. 1 are also the subject of a recent decision by another panel of this court. See MCI Telecommunications Corp. v. Matrix Communications Corp., 135 F.3d 27 (1st Cir.1998). That case involved an agreement to arbitrate contained in a contract whereby Matrix would provide certain non-telecommunications services to MCI. The only question before the panel was whether the agreement to arbitrate encompassed all disputes relating to the contract, or merely a certain sub-category of disputes. In contrast, the question presently before us is whether there was a valid arbitration agreement in the first place. The prior panel's decision is therefore not dispositive of this appeal.

tual obligations. The FAA merely provides a tribunal in which, if certain jurisdictional and subject-matter criteria are met, private disputes may be resolved. After all, "arbitration agreements [can be] enforce[d] as [with] other contracts, but not more so." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n. 12, 87 S.Ct. 1801, 1806 n. 12, 18 L.Ed.2d 1270 (1967); *see also* H.R.Rep. No. 68–96, at 1 (1924). Arbitration under this statute "is a matter of consent, not coercion." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57, 115 S.Ct. 1212, 1216, 131 L.Ed.2d 76 (1995).

The need for an agreement, or more accurately, one that is in writing, as condition to gaining access to the umbrella provided by the FAA, manifests itself throughout the various provisions of this law. For example, section 2 of the FAA provides that "[a] *written* provision in any ... contract, or an agreement in *writing* to submit to arbitration," is valid and enforceable "save upon such grounds as exist at law or equity for the revocation of any contract." 9 U.S.C. § 2 (emphasis added). Similarly, section 4 states that "[i]f the making of the arbitration agreement ... be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. Section 4 further provides that "[w]here such an issue is raised," a jury may be requested, and "[i]f the jury find that no agreement in *writing* for arbitration was made ... the proceeding shall be dismissed," but "[i]f the jury find that an agreement for arbitration was made in *writing* ... the court shall make an order summarily directing the parties to proceed with the arbitration." *Id.* (emphasis added). Section 13 of the FAA also provides that a party seeking enforcement of an arbitration award must file a copy of "[t]he agreement" with the clerk of the district court as a prerequisite to the entry of judgment, which implies that the agreement must be in writing. *See* 9 U.S.C. § 13.

From this review of the FAA, it is apparent that determining whether there is a written agreement to arbitrate the controversy in question is a first and crucial step in any enforcement proceeding before a district court. It is also apparent that in such a quest, as is the situation in any other breach of contract suit, if one of the parties alleges the inexistence of the contract, such a party is entitled to present evidence before the fact finder in support of this position. That, of course, is exactly what Exalon has attempted to do but was barred from doing by the trial court's determination that Exalon failed to comply with section 12's requirement that any challenges to an arbitral award be made within the three-month period following the award.

The question thus comes down to determining whether that provision applies to one who denies the very existence of the condition that triggers the applicability of that statute, i.e., a written agreement to arbitrate such a dispute. Stated in perhaps more familiar arbitral terminology, the issue could be restated as one involving a question of arbitrability. Although normally that handle is reserved for disputes in which the issue is not the existence of an agreement to arbitrate but rather whether specific subjects are within the coverage of the agreement to arbitrate, a claim that *nothing* is subject to arbitration because there is *no* agreement to arbitrate must be the mother of arbitrability questions.

■ This is a rather important point, for unless the parties have agreed to submit the issue of arbitrability to determination by the arbitrator, the arbitrability of that dispute is subject to independent review by the courts, applying standard contract law analysis. *See First Options*, 514 U.S. at 942–47, 115 S.Ct. at 1923–26; *Mastrobuono*, 514 U.S. at 52, 115 S.Ct. at 1213–14. MCI makes no claim, nor do we understand it to be part of the district court's reasoning, that Exalon agreed to arbitrate arbitrability, and with good reason, for this record would not support a finding that there is "clea[r] and unmistakabl[e] evidence that the parties so intended." *First Options*, 514 U.S. at 944, 115 S.Ct. at 1924. But can the operation of law, in this case of section 12 of the FAA, prevent Exalon from litigating arbitrability before the courts? That is, pursuant to the FAA, can a person who in fact has not been a party to a written arbitration agreement but who is on notice that an arbitration proceeding has been invoked claiming

to have binding effect against his/her interests, be obligated by the outcome unless an affirmative challenge is made against the award?

We think not, for reasons compelled by the language and structure of the FAA. We find no indication that Congress intended for a party to be found to have waived the argument that there was no written agreement to arbitrate if that party failed to raise the argument within the time period established by section 12. To the contrary, a different conclusion would be inconsistent with the most natural reading of section 4 of the FAA. Section 4 of the FAA provides, in pertinent part:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any ... district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C. § 4. Upon receipt of such a petition, the district court determines whether there was an agreement to arbitrate. If the existence of the agreement is not in issue, the court must proceed forthwith to "make an order directing the parties to proceed to arbitration." In contrast, "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." MCI's position is that a party "aggrieved by the failure ... of another to arbitrate" may initiate arbitration on its own and prevail by default, rather than first seeking an order under section 4. But the focus of section 4 is on the party seeking arbitration, who must affirmatively petition for a court order enforcing the agreement. It is unlikely that Congress intended to allow the provisions of section 4 to be bypassed so easily.

We thus conclude that, as a general matter, section 12, as well as section 2 and the other enforcement provisions of the FAA, do not come into play unless there is a written agreement to arbitrate. Thus, if there is no such agreement, the actions of the arbitrator have no legal validity. It follows that one is not required to mount a collateral challenge to such an ineffectual action, for if the agreement to arbitrate does not exist, there is no obligation to arbitrate—and a noncontracting person's failure to appear at the arbitration hearing does not create such an obligation.

A party that contends that it is not bound by an agreement to arbitrate can therefore simply abstain from participation in the proceedings, and raise the inexistence of a written contractual agreement to arbitrate as a defense to a proceeding seeking confirmation of the arbitration award, without the limitations contained in section 12, which are only applicable to those bound by a written agreement to arbitrate. Of course, if a court later determines that an arbitration agreement was in effect, and that the non-appearing party was bound by its conditions, the FAA would then fully come into operation, including the time limitations of section 12.

As a matter of trial strategy, this situation is analogous to where a lawsuit proceeds against a non-appearing party over whom personal jurisdiction has not been acquired. That party can challenge the judgment when it is executed, for it lacks legal validity. Of course, if the court determines that personal jurisdiction did in fact exist, that party would normally be barred from collaterally attacking the merits of that judgment. In both the FAA and personal jurisdiction contexts, albeit for different reasons, the non-appearing party can subsequently challenge the authority of the decision-maker, but not the merits of the decision.

The cases relied upon by the magistrate judge for ruling that section 12 barred Exalon from raising the inexistence of a written contract to arbitrate as a defense to enforcement of the award, *Cullen v. Paine, Webber, Jackson & Curtis, Inc.*, 863 F.2d 851 (11th Cir.1989), and *Professional Administrators Ltd. v. Kopper-Glo Fuel, Inc.*, 819 F.2d 639 (6th Cir.1987), are inapposite as they involve situations in which a participant in the arbitration proceeding thereafter failed to meet the time limits of section 12. It seems reasonable to conclude that participation in the litigation of the merits of a controversy before an arbitration panel, at the very least binds the party to the procedural require-

ments that emanate from that process. Of course, that is not the situation before us.

A closer case is *Comprehensive Accounting Corporation v. Rudell,* 760 F.2d 138 (7th Cir.1985). However, although the issue as framed by the Seventh Circuit is the same as that before us, there is at least one crucial distinguishing factual difference, and that is the existence of a "signed contract ... [which] contained a standard arbitration clause." *Id.* at 139. This condition alone is sufficient to take that case beyond of the scope of the issues presented by this appeal, for as the court in *Comprehensive Accounting* recognized, the outcome might have been different "[i]f there had been no arbitration clause, ... [b]ut that is not the case. There is an arbitration clause, and [appellants] concede that it covers this dispute." *Id.* at 140.

■ In conclusion, we rule that the time limits provided by section 12 for the vacation, modification, or correction of an award do not prevent a party who did not participate in an arbitration proceeding from challenging the validity of the award at the time of its enforcement on the basis that no written agreement to arbitrate existed between the parties.[3]

The decision of the district court is *reversed* and the case is *remanded* for proceedings consistent with this opinion. In particular, since the district court below did not determine whether the parties had entered into a written agreement to arbitrate, the district court on remand shall conduct the fact finding procedures that are required by section 4 of the FAA. 9 U.S.C. § 4. Costs are granted to appellant.

---

3. We thus express no opinion on the question whether the MCI Tariff F.C.C. No. 1 constituted a written agreement to arbitrate for purposes of the FAA. That question shall be answered on remand by the district court.