**INTERNATIONAL TECHNOLOGIES INTEGRATION, INC., Plaintiff,**

v.

**THE PALESTINE LIBERATION ORGANIZATION and The Palestinian National Authority, Defendants.**

**No. CIV.A.98–00756 (CKK).**

United States District Court, District of Columbia.

June 22, 1999.

**4**

John David Seiver, Cole, Raywid & Braverman, L.L.P., Washington, DC, for Plaintiff.

Walter J. Pozen, I, Stroock & Stroock & Lavan, Washington, DC, for Defendants.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

To resolve a dispute arising under an agreement between the Plaintiff International Technologies Integration, Inc. ("ITI") and the Defendants the Palestine Liberation Organization ("PLO") and the Palestinian National Authority ("PNA"), ITI commenced arbitration by filing a Demand for Arbitration with the American Arbitration Association ("AAA") and forwarding copies of the Demand by both registered mail, return-receipt requested and facsimile to the PNA's president and two ministers. To neither this Demand nor to numerous other notices of the arbitration proceedings sent by both ITI and the AAA did the Defendants respond. On October 15, 1997, after conducting an *ex parte* arbitration, an arbitrator found that the PLO and the PNA were liable to ITI in the amount of $18,750,000 for breach of contract. More than ninety days after the Defendants were served with the arbitrator's award, ITI filed a motion to confirm the award in the District of Columbia Superior Court, which was served on the Defendants by registered mail, return-receipt requested at the same addresses to which all previous arbitral notices had been sent. Responding to the Superior Court summons, the Defendants removed to this Court pursuant to 28 U.S.C. § 1441(d), and concomitantly raised several affirmative defenses, including lack of notice, in moving to vacate the arbitration award.

Only two issues need be resolved by this Court: 1) did the Defendants receive adequate notice of the arbitration proceedings and 2) if so, are they now precluded from moving to vacate the arbitrator's award. After reviewing the parties' briefs, exhibits, supplemental responses to this Court's May 27, 1999 Order, and comments at oral argument, the Court answers each issue in the affirmative. Accordingly, ITI's motion to confirm is granted.

## I. Background

On September 13, 1993, the PLO, acting as representative of the Palestinian people, and the Government of Israel signed the Declaration of Principles on Interim Self-Government Arrangements, which extended limited political autonomy to Palestinians within the West Bank and the Gaza Strip. Emerging from this historic accord was the PNA, the political entity in which is reposed the Palestinian executive, legislative, and judicial powers. Among the PLO's chief developmental objectives was to "rebuild and modernize the telecommunications network in the Palestinian Territory." Decl. of Mohammed Rachid ¶ 2.[1] ITI is an advanced-technology, research, and engineering firm incorporated in the Commonwealth of Virginia that provides telecommunications services throughout the world. *See* Decl. of Howard Graff ¶ 2. On October 3, 1993, ITI executed two substantively identical agreements[2] with both the PLO and the PNA, under which the PNA[3] allegedly granted to ITI the exclusive, non-terminable right to develop a domestic and international communications and telecommunications network in the West Bank, Jericho, and the Gaza Strip. *See id.* at Exs. A & B.

Three discrete provisions in the Agreement, which will receive more elaborate examination later, warrant brief attention at the outset. First, in Article 2.1 of the Agreement, the parties elected to resolve all disputes by submitting them to binding arbitration in Washington, D.C. under the aegis of the AAA. Second, Article 3 specified that the Agreement was to be interpreted and enforced in accordance with and governed by the laws of the state of Virginia. And lastly, Section 8.2 of the Conditions of Contract for Telecommunication Concession (Sharing) Agreement—Gaza Strip/West Bank ("Conditions of Contract"), a document annexed to the Agreement, specified that

> [a]ny notice, demand or other communication required or permitted to be given pursuant to the Agreement shall be in writing and shall be (i) personally delivered to an individual then designated as a party's representative . . . (ii) transmitted by postage prepaid registered mail (airmail if international), or (iii) transmitted by telefax or telex (with answerback confirmation).

Conditions of Contract, § 8.2 (Decl. of Graff at Ex. C). Section 8.2 further provided that notices to the PNA were to be addressed to the PNA in Jericho, Palestine, directed to the attention of "H.E. The President." Beyond these specifications, however, Section 8.2 was silent, if not cryptic. Although it indicates that a post office box is part of the address, there is merely a blank line following the "P.O. Box" line. Moreover, where there should be numbers or other data, only blank lines follow such categories as "Telex Number," "Answerback," and "Fax." *See* Conditions of Contract, § 8.2, at 16.

At the time that the parties entered into the Agreement, Chairman Arafat was residing in Tunis, Tunisia, where, in fact, the contract was signed. *See* Decl. of Dennis F. Schonacher ¶ 2; Decl. of Graff at Exs. A (Agreement between ITI and the PLO indicating that "[t]his AGREEMENT is made and entered into in Tunisia on the Third day of October 1993 . . . ."); *id.* at Ex. B (Agreement between ITI and the PNA indicating that "[t]his AGREEMENT is made and entered into in Tunisia on the third day of October 1993 . . . ."). Once Chairman Arafat permanently moved to Palestine, ITI directed all written correspondence with the Office of the President

---

1. Although counsel for the PNA spells the declarant's name "Rashid," correspondence between the parties, including letters signed personally by the declarant, indicate that his name is spelled "Rachid."

2. Because both agreements are substantively identical, the Court shall collectively refer to them as the "Agreement."

3. Unless the Court specifies otherwise, further references in this Memorandum Opinion to the PNA also include the PLO.

of the PNA to the Gaza address. *See* Decl. of Schonacher ¶ 4; *id.* at Ex. 1 (various letters sent by ITI to the Office of President in Gaza). Moreover, ITI conducted all telephone and facsimile communications with the Office of the President by dialing Gaza phone numbers. *See id.* ¶ 4. Indeed, it was in Gaza that Chairman Arafat, accompanied by representatives from ITI, MCI, and Bezeq, an Israeli telecommunications company, announced a formal transfer of the telecommunications system in Palestine from Bezeq to ITI. *See id.* ¶ 5.

Approximately three years after the parties executed the Agreement, ITI concluded that the PNA wrongfully terminated the Agreement, and, pursuant to Article 2.1 of the Agreement, commenced arbitration by filing a Demand for Arbitration ("Demand") with the AAA on November 12, 1996. ITI, in turn, served copies of the Demand on Yasser Arafat, Chairman of the Executive Committee of the PLO and President of the PNA, His Excellency Eng. Imad Al Falouji, Minister of Post and Communication, and His Excellency F. Abu–Medein, Minister of Justice. For each of the three PNA officials on whom ITI served a copy of the Demand, ITI employed both registered mail, return-receipt requested and facsimile transmission—totaling six separate notices to the PNA.[4] All three facsimiles were transmitted successfully, *see* Decl. of Graff ¶ 7 and Exs. F, G, & H (copies of facsimile confirmations to all three recipients), and a stamped return-receipt indicates that the Minister of Post & Communications received the Demand on November 28, 1996. *See id.* at Ex. I (copy of stamped return-receipt to H.E. Imad Al Falouji); *see also id.* at Ex. J (copy of the Affidavit of Service of Lynn Wiegand (original was submitted to the Arbitrator), attesting that

the Demand was served on each of the three PNA officials by registered mail, return-receipt requested and by facsimile). Copies of the Demand were served on each of the three PNA officials at the Gaza addresses that ITI had consistently used to communicate successfully with the PNA. Despite these notices, the PNA never contacted ITI.

Meanwhile, the AAA administrator, Luis M. Martinez, was taking preliminary steps to orchestrate ITI's arbitration demand. On December 5, 1996, he sent a letter to both parties to advise them that the AAA had received ITI's Demand, that the PNA had forty-five days from that point to file a statement of defense and counter-claims, and that he hoped to schedule an administrative conference. *See* Decl. of Luis M. Martinez ¶ 3 & Ex. A. AAA documents indicate that a facsimile of Martinez' letter was successfully transmitted to the PNA's Ministry of Post and Communication. *See id.* at Ex. B. A stamped copy of the Martinez letter that was sent to Minister Imad Al Falouji bears an official PNA stamp that reads, according to the certified translation: "The Palestinian National Authority, Ministry of Post and Communication, Office of the Minister." *See* Decl. of Graff at Ex. K (containing stamped-copy of letter and certified translation). The translation also indicates "American Arbitration Association No. 266/26" and the date of "12/12/96." The PNA did not respond.

Two months later, Martinez sent another letter to ITI and the PNA's Minister of Post and Communication. *See* Decl. of Martinez ¶ C. While notifying the parties of prospective arbitrators and requesting their preferences, Martinez also used this opportunity to admonish the PNA about the consequences of failing to participate in the upcoming arbitration:

---

4. In addition to authorizing parties to service notice on each other by mail and by personal service, Rule 40 of the AAA's Commercial Arbitration Rules, which is incorporated into the parties' arbitration agreement, *see* AAA Rule 1, provides that "[t]he AAA and the

parties may also use facsimile transmission, telex, telegram, or other written forms of electronic communication to give the notices required by these rules." AAA R. 40. The requirements and mechanics of Rule 40 are examined in greater detail *infra.*

Failure to [submit a list of preferred arbitrators] will be deemed an acceptance of the entire list. Please note that this Association has not received a response from the Respondent. It is our policy that absent a Court Order or an agreement by the parties, the arbitration will proceed as to all parties. If one party fails to participate the arbitration will proceed exparte [sic], meaning one party. In the event that any party does not participate it is advised that they attend the hearings because failure to attend will not prevent the arbitrator from issuing an award that can be enforced in either country.

Decl. of Martinez at Ex. C. As he did with his December letter, Martinez faxed a copy of his letter to the PNA's Minister of Post and Communication. Likewise, AAA records indicate that the fax was sent successfully, *see id.* at Ex. D, and the stamp affixed to the fax cover sheet has been translated as: "Stamp of The Palestinian National Authority, Ministry of Post and Communication, Office of the Minister." Decl. of Graff at Ex. L. Having received no response from the PNA, the AAA designated Biagio Civale as Arbitrator, and through Martinez, issued a Notice of Hearing for March 28, 1997. *See* Decl. of Martinez at Ex. E. Once again, a stamp on the facsimile cover sheet sent to the PNA reads: "Stamp of The Palestinian National Authority, Ministry of Post and Communication, Office of the Minister." Handwritten notations also indicate that the facsimile was "Received 03/26/——7." Decl. of Graff at Ex. M.

Presumably concerned about the PNA's absence, Arbitrator Civale ordered ITI to contact the Office of the PLO in Washington, D.C. about the pending arbitration. *See* Decl. of Graff ¶ 17. On April 8, 1997, Counsel for ITI complied by sending a brief letter to Minister Imad Al Falouji by facsimile and registered mail, return-receipt requested to both the Gaza address as well as the Office of the PLO in Washington, D.C., in care of Mr. Said Hamad,

the Deputy Chief Representative of the PLO. *See id.* A stamp on the facsimile cover sheet sent to the Office of the PLO in Washington, D.C. reads: "Stamp of The Palestinian Liberation Organization." Handwritten in English on the face of the document appear the words: "Received APR 11, 1997." *See id.* at Ex. N. This letter also failed to precipitate a response from the PNA. Accordingly, pursuant to the AAA's rules, the Arbitrator conducted the proceeding *ex parte.*

To substantiate its claim, ITI submitted a number of affidavits and other written documentation to the Arbitrator between April and October of 1997. *See* Decl. of Graff ¶ 19. Notwithstanding the PNA's absence, Arbitrator Civale directed ITI to serve the PNA with copies of every submission that it tendered to him. *See id.* ¶ 20. Significantly, ITI served copies of its arbitral submissions on the PNA's President, Yasser Arafat, the Minister of Justice, F. Abu–Medein, and the Minister of Post and Communication, Imad Al Falouji at their Gaza addresses. *See id.* Because the question of notice assumes dispositive significance in this litigation, it is essential to chronicle ITI's various submissions:

● Three returned receipts to President Arafat, Minister F. Abu–Medein, and Minister Imad Al Falouji acknowledge that the PNA received ITI's April 25, 1997 letter to Arbitrator Civale containing ITI's witness list and suggested testimony. *See id.* at Ex. O.

● Three facsimile confirmations sent to President Arafat, Minister F. Abu–Medein, and Minister Imad Al Falouji indicate that ITI's April 25, 1997 letter was transmitted successfully. *See id.* at Ex. P.

● Three DHL Shipment Airwaybills indicate that ITI mailed its initial submissions to President Arafat, Minister F. Abu–Medein, and Minister Imad Al Falouji on May 12, 1997. *See id.* at Ex. Q.

- A DHL log indicates that ITI's May 12, 1997 initial submissions were delivered to H.E. Eng. Imad Al Falouji.
- DHL Airwaybill 9146324924, which contained ITI's May 12, 1997 initial submissions that were mailed to President Arafat, was received on May 20, 1997 by "Yousra." ITI maintains, and the PNA has not suggested to the contrary, that "Yousra" refers to Yousra Jamil Hassanat, who works in the PNA Presidential Office in Gaza, and who is responsible for President Arafat's "In" & "Out" mail. *See id.* at Ex. S.
- DHL Airwaybill 9146325134, which contained ITI's May 12, 1997 initial submissions that were mailed to Minister F. Abu–Medein, was received on May 20, 1997 by "Nahed." Unchallenged by the PNA, counsel for ITI has averred that "Nahed" refers to Nahed Ichtaouie, who serves as the private secretary to Minister F. Abu–Medein. *See id.* at Ex. T.
- DHL Airwaybill 9100955861, which contained ITI's subsequent May 15, 1997 submission that was mailed to Minister F. Abu–Medein, was received on June 2, 1997 by "Rahada Bsaiso." Counsel for ITI maintains that Rahada Bsaiso is the assistant to the private secretary to Minister F. Abu–Medein. *See id* at Ex. U. The PNA does not suggest anything to the contrary.
- DHL Airwaybill 9100955846, which contained ITI's subsequent May 15, 1997 submission that was mailed to Minister Imad Al Falouji, was received. *See id.* at Ex. V.
- A document that is purportedly from DHL confirms that ITI's subsequent May 15, 1997 submission that was mailed to President Arafat was received on or about May 26, 1997.

Having never received from the PNA a responsive submission or even so much as a request for an extension of time, Arbitrator Civale rendered his arbitration award ("Award") on October 15, 1997. Although he found that "the Defendants have breached their obligations to perform un-der the contracts," he declined to award ITI the full value of its expectation damages. *See* Decl. of Graff at Ex. X (written Award of Arbitration). Concluding that "[t]he award of money to ITI, as compensation for work initially performed, during almost one tenth of the life of the agreement, cannot be greater than one tenth of the value assigned by the experts for a 25 years performance," Arbitrator Civale awarded $18,750,000 (inclusive of all expenses attendant with prosecuting the arbitration) to ITI. *See id.*

After the Award was filed on November 13, 1997, Luis M. Martinez of the AAA sent the Award to the PNA via United Parcel Service ("UPS"). *See* Decl. of Martinez ¶ 8; Decl. of Graff ¶ 24. As with all previous correspondence sent from the AAA, the Award was addressed to H.E. Eng. Imad Al Falouji, Minister of Post and Communication, in Gaza. *See* Decl. of Graff ¶ 24. Martinez subsequently received a UPS Delivery Notification that indicated that the Award was delivered on November 26, 1997, and was signed for by "Shalom." In paragraph 25 of his declaration, which the PNA has not rebutted, counsel for ITI avers that Ihab Rassem El Ghoul, an assistant to Yousra Hassanat in the PNA Presidential Office in Gaza, routinely signs delivery receipts with the word "Shalom." *See id.* ¶ 25.; *see also* Decl. of Martinez at Ex. L (copy of the UPS Delivery Notification indicating that one parcel was delivered on 11/26/97 at 3:52 P.M. and that the shipment was signed for by "SHALOM").

On March 2, 1998, ITI filed a Motion to Confirm Arbitration Award in the District of Columbia Superior Court. Pursuant to D.C. SUPER. CT. R. 4(f)(2)(C)(ii), the Clerk of the Court served a copy of the summons and ITI's motion by registered mail, return-receipt requested on President Arafat, Minister F. Abu–Medein, and Minister Imad Al Falouji at the addresses that ITI and the AAA had used to serve all arbitral notices. A copy of the return-receipt mailed to President Arafat indicates that

he received the summons and motion on March 16, 1998. Four days later, the PNA's Minister of Finance informed Mohammed Rachid, Economic Advisor to President Arafat, that ITI had brought an arbitration in Washington, D.C., that an award was rendered in ITI's favor in the amount of $18,750,000, and that ITI had commenced legal proceedings in Washington, D.C. to confirm the award. *See* Decl. of Rachid ¶ 21. Defendants timely removed ITI's action to this Court pursuant to 28 U.S.C. § 1441(d) on March 24, 1998.

## II. DISCUSSION

### A. *Virginia's codification of the Uniform Arbitration Act governs this proceeding*

Before turning to the merits, the Court must resolve a question that neither party has raised. While both ITI and the PNA have assumed throughout that this proceeding is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1–16, this Circuit's decision in *Ekstrom v. Value Health, Inc.*, 68 F.3d 1391, 1395–96 (D.C.Cir.1995), coupled with the Agreement's choice-of-law provision in Article 3, compels the Court to apply Virginia's codification of the Uniform Arbitration Act, VA. STAT. § 8.01–581.01 *et seq*. In *Ekstrom*, the parties executed a contract in which they agreed to resolve any disputes through binding arbitration. In a "Governing Law" section, the parties further provided that the agreement "shall be governed by and construed in accordance with the internal laws of the State of Connecticut." *Id*. at 1393. After a dispute arose, an arbitrator entered an award in the plaintiff's favor. Within ninety, but more than thirty, days from receiving the award, the defendant moved to vacate the award under the FAA, 9 U.S.C. § 10. While the FAA permits a party to move to vacate an arbitration award within ninety days of its delivery, *see* 9 U.S.C. § 12, Connecticut's arbitration law bars any motion to vacate filed later than thirty days from delivery of the award, *see* CONN. GEN. STAT. ANN. § 52–420(b). Although both parties conceded that Connecticut's substantive law on contracts and arbitrability should govern the agreement, they differed over whether the state's law controlled issues relating to the timeliness of petitions to vacate arbitration awards.

To resolve this inquiry, the D.C. Circuit first observed that "choice of law provisions in contracts are generally understood to incorporate only substantive law, not procedural law such as statutes of limitation." *Id*. at 1395 (brackets omitted) (quoting *Federal Deposit Ins. Corp. v. Petersen*, 770 F.2d 141, 142–43 (10th Cir. 1985)). Yet the Circuit determined that, under Connecticut law, "a statute of limitation is 'substantive' when it applies to a right created by statute, as opposed to a right recognized at common law." *Id*. (citing *Baxter v. Sturm, Ruger & Co.*, 230 Conn. 335, 644 A.2d 1297, 1299 (1994)). Connecticut, like Virginia, has adopted the Supreme Court's rationale in *Davis v. Mills*, 194 U.S. 451, 454, 24 S.Ct. 692, 48 L.Ed. 1067 (1904), that a limitations period is substantive if it is " 'directed to the newly created liability so specifically as to warrant saying that it qualifie[s] the right.' " *Thomas Iron Co. v. Ensign–Bickford Co.*, 131 Conn. 665, 42 A.2d 145, 147 (1945) (quoting *Davis*, 194 U.S. at 454, 24 S.Ct. 692); *see also Jones v. R.S. Jones & Assocs.*, 246 Va. 3, 431 S.E.2d 33, 35 (1993) (adopting the *Davis* formulation); *Overstreet v. Kentucky Central Life Ins. Co.*, 950 F.2d 931, 935 (4th Cir.1991) (same). From there, the Circuit had little difficulty concluding that Connecticut arbitration law governed.[5]

---

5. The D.C. Circuit also examined, and rejected, the defendants' argument that the FAA pre-empted Connecticut's arbitration law. *See Ekstrom*, 68 F.3d at 1395–96. Interestingly, although *Ekstrom* was argued and decided after the Supreme Court issued its opinion in *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995), *Mastrobuono* is never cited in *Ekstrom*. Moreover, one of the cases

■ Moreover, several years before *Ekstrom*, Judge Stanley Harris of this Court explicitly held that where the parties agreed to arbitrate disputes under the AAA and in accordance with Virginia law, Virginia's arbitration law, not the FAA, governed determinations of the validity of the arbitration award. *See Flight Sys. v. Paul A. Laurence Co.*, 715 F.Supp. 1125, 1127–28 (D.D.C.1989). Under both *Ekstrom* and *Flight Systems*, there can be no doubt that ITI's motion to confirm and the PNA's petition to vacate the arbitration award must be analyzed under Virginia law.

B. *The mechanics of vacating arbitration awards under Virginia's arbitration law*

Once an arbitrator has rendered his award, a party may move to vacate that award under a narrow set of circumstances:

Upon application of a party, the court shall vacate an award where:

1. The award was procured by corruption, fraud or other undue means;

2. There was evident partiality by an arbitrator appointed as a neutral, corruption in any of the arbitrators, or misconduct prejudicing the rights of any party;

3. The arbitrators exceeded their powers;

4. The arbitrators refused to postpone the hearing upon sufficient cause being shown therefor or refused to hear evidence material to the controversy or otherwise so conducted the hearing … in such a way as to substantially prejudice the rights of a party; or

5. There was no arbitration agreement and the issue was not adversely determined in proceedings [to compel arbitration] and the party did not participate in the arbitration hearing without raising the objection.

Va. Stat. § 8.01–581.010(1)–(5).[6] To promote one of arbitration's virtues—efficiency and swiftness—a party seeking to vacate an award must file an application "within ninety days after delivery of a copy of the award to the applicant." *Id.* § 8.01–581.010. Although a party may either file an application to vacate by initiating its own court action or "raise[ ] reasons supporting vacation in response to another party's petition to confirm that award," the applicant must nevertheless present its arguments to a court of competent jurisdiction within the ninety-day time frame. *See id.*

■ Without doubt, "an arbitrator must provide a fundamentally fair hearing." *Generica Ltd. v. Pharmaceutical Basics, Inc.*, 125 F.3d 1123, 1130 (7th Cir. 1997). Among the "minimal requirements of fairness" is a right to receive "adequate notice" of arbitral proceedings. *Id.; accord Iran Aircraft Indus. v. Avco Corp.*, 980 F.2d 141, 146 (2d Cir.1992); *Hoteles Condado Beach v. Union De Tronquistas*, 763 F.2d 34, 40 (1st Cir.1985); *Hall v. Eastern Air Lines, Inc.*, 511 F.2d 663, 663–64 (5th Cir.1975). Speaking generally to the bedrock importance of notice, the Supreme Court observed almost fifty years ago that "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all

that the D.C. Circuit cites in *Ekstrom* to establish that the FAA did not pre-empt Connecticut law was a Second Circuit case whose holding was explicitly overruled by the Supreme Court in *Mastrobuono*. *See Fahnestock & Co. v. Waltman*, 935 F.2d 512, 517 (2d Cir.1991) (cited in *Ekstrom*, 68 F.3d at 1396), *overruled by Mastrobuono*, 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). Although the Court follows *Ekstrom*, because there is little substantive difference between the FAA

and Virginia's codification of the Uniform Arbitration Act, the Court will examine both statutes where appropriate.

6. With the exception of subsection 5 of Virginia's codification of the Uniform Arbitration Act, the FAA's four bases for vacating an arbitration award are practically identical. *See* 9 U.S.C. § 10(a)(1)-(4).

the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Regardless of the temporal limitations set forth in Virginia's arbitration act or the FAA, neither statute would foreclose a court from vacating an arbitrator's award where a party was never served with a single notice, and where that party had no constructive notice or other knowledge of the arbitration. For "when notice is a person's due, process which is a mere gesture is not due process." *Id.* at 315, 70 S.Ct. 652. In such extreme circumstances, it would defy logic and fundamental fairness to permit a party to obtain an arbitral award over an opponent by shrouding the proceedings in a cloak of invisibility.

What this Court must determine, therefore, is whether the PNA received adequate notice of the arbitration. For if the PNA was ignorant of the proceedings, that would be all that this Court need determine; such a miscarriage of fundamental fairness would compel vacatur. That said, it is equally obvious that if the PNA, in fact, received adequate, albeit imperfect, notice of the arbitration, little would be left for this Court to do than simply grant ITI's motion to confirm the Award.

### C. *The PNA received adequate, if not actual, notice of the arbitration*

By agreeing to arbitrate under the aegis of the AAA, ITI and the PNA incorporated into their Agreement the AAA's Commercial Arbitration Rules. *See* AAA R. 1 ("The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association . . . ."). Among those is Rule 40, which governs how each party is

to serve notice on the other. Divided into two paragraphs, Rule 40 first specifies on whom, at which address, and by which methods notice must be given; its last paragraph expands the methods for service to encompass electronic forms of written communication:

**40. Serving of Notice**

Each party shall be deemed to have consented that any papers, notices, or process necessary or proper for the initiation or continuation of an arbitration under these rules . . . may be served on a party by mail addressed to the party or its representative *at the last known address* or by personal service, in or outside the state where the arbitration is to be held, provided that reasonable opportunity to be heard with regard thereto has been granted to the party.

The AAA and the parties may also use facsimile transmission, telex, telegram, or other written forms of electronic communication to give the notices required by these rules.

AAA R. 40 (emphasis added).

▪ Straightforward application of Rule 40 to the facts of this case manifestly establishes that ITI properly served the PNA with notice of its Demand. First, ITI's method of service is beyond reproach. It not only sent copies of the Demand by facsimile but also by registered mail, return-receipt requested—a method of service that exceeds Rule 40's modest requirements. The PNA's sole protest is that ITI and the AAA sent notices to Gaza instead of Jericho. According to the PNA, Section 8.2 of the Conditions of Contract established Jericho as the PNA's last known address for purposes of complying with Rule 40. Notably, the PNA does not argue that the service requirements set forth in Section 8.2 of the Conditions of Contract displace or modify Rule 40.[7] Rather, it maintains that Sec-

---

7. One certainly might have construed Section 8.2 as a complete displacement or modification of Rule 40. Pursuant to Rule 1 of the AAA's Commercial Arbitration Rules, "[t]he

parties, by written agreement, may vary the procedures set forth in these rules." AAA R. 1. Of course, it is not clear that this would alter the Court's decision. Moreover, the

tion 8.2 operates in tandem with Rule 40 by simply designating the "last known address" to which notices should be sent. *See* PNA's Memorandum in Response to the Court's Order of May 27, 1999 at 3–4; *see also* Tr. of Hr'g, May 4, 1999, at 24:24–25:3 ("And it is not a question of whether we are modifying Rule 40 of the AAA. I believe that Rule 40 of the AAA requires them to send it, to make a good faith effort to deliver it to the last known address. I believe that 8.2 tells them the last known address for this purpose.") (statement of counsel for the PNA).

Such an interpretation of Section 8.2, which the Court assumes to be correct, fails to cast a pall of illegitimacy over ITI's service efforts. As of October 3, 1993, when the Agreement was ratified along with the Conditions of Contract, Jericho may very well have been the PNA's last known address. But if all Section 8.2 is designed to do is notify ITI of a last known address, then there is nothing—not only in the Agreement, but certainly nothing in Rule 40—that would prevent ITI from sending notices to an address that they later come to use and recognize as the PNA's last known address. As the undisputed evidence before the Court dramatiz-

es, from almost the Agreement's inception, ITI successfully communicated with the PNA by directing correspondence to its Gaza address.[8] Indeed, the PNA itself provided ITI with business cards on which Gaza, not Jericho, addresses and phone and fax numbers were printed. By way of example, the fax number provided on the personal business card of His Excellency Imad Al Falouji, Minister of Post and Communication, is identical to the one that both ITI and the AAA used to send notices of the arbitration. *Compare* Decl. of Schonacher at Ex. 3 (business card of Imad Al Falouji, Minister of Post and Communication, providing a fax number of 972–7–824555) *with* Decl. of Graff at Ex. F (fax confirmation sheet indicating that Demand was successfully sent to the Ministry of Post and Communication at 972–7–824555). Similarly, the Minister of Justice's business card indicates that his address is in the Abu Khadra Building in Gaza to which ITI sent arbitral notices, *see* Decl. of Schonacher at Ex. 4, while business cards from officials in the Office of the President confirm that ITI sent notices to accurate and functioning addresses and fax numbers, *see id.* at Exs. 5–6. Accordingly, because ITI complied with AAA Rule 40 by send-

Seventh Circuit's decision in *Gingiss International, Inc. v. Bormet*, 58 F.3d 328, 331–32 (7th Cir.1995), held that a provision akin to Section 8.2 merely spoke to notices required by the underlying contract. For notices sent pursuant to arbitration proceedings, the Seventh Circuit found that Rule 40 remained the governing instrument.

8. Counsel for the PNA takes great liberties with the declaration of Mohammed Rachid, the Economic Advisor to President Arafat, in an attempt to portray Gaza as a city wreaked with chaos and political and economic naivete while heralding Jericho as a sophisticated city accustomed to "day-to-day legal and commercial issues." PNA's Memorandum in Response to the Court's Order of May 27, 1999 at 2. While Rachid underscores a number of infrastructure deficiencies within the Palestinian territories, his declaration speaks to the territories as a whole; none of his comments is unique to Gaza, nor for that matter does he indicate that Jericho is insulated from these same difficulties. *See* Decl. of Rachid ¶ 22. Indeed, some of counsel's state-

ments of "fact" about the PNA, supported nowhere in Rachid's declaration, are patently incorrect. Although counsel boasts that Jericho "is the economic center of Palestine and the seat of the legislative, executive, and judicial branches of the PNA," the reality is that Jericho is a city inhabited by 28,083 while the Gaza area boasts nearly a million persons. *See* The Palestinian National Authority, Ministry of Information, *Basic Information About Palestine* (visited June 8, 1999) <http://www.pna.org/mininfo/general/palestin.html>. Moreover, the Office of the President and the majority of PNA ministries and their ministers, including the Ministry of Justice and the Ministry of Post and Communication, are located in Gaza, not Jericho. *See* Permanent Observer Mission of Palestine to the United Nations, *Ministries of the Palestinian Authority* (visited June 8, 1999) <http://www.palestine-un.org/dir/min.html>. Only the Ministry of Local Government is located in Jericho. *See id.*

ing notice of its Demand for Arbitration to the PNA at its last known address, the Court concludes that the PNA received adequate notice of the pending arbitration.

Moreover, even if Section 8.2 were construed to constitute an irrevocable designation of the PNA's "last known address," any objection to receiving notice in Gaza is simply to the form of the notice, not to whether it was adequate to comport with minimal fairness. Indeed, at oral argument counsel for the PNA made an important concession about the sufficiency of the notice that ITI sent to the PNA. Asked whether the notices that ITI sent to the PNA in Gaza would otherwise satisfy Rule 40 if the Conditions of Contract had not contained Section 8.2, counsel responded:

> Your Honor, it's very hard for me to answer that without 8.2 If 8.2 didn't exist and [Gaza] was the last known address, *then they would be fine. I don't have any doubt about that.*

Tr. of Hr'g, June 4, 1999, at 24:20–:23 (emphasis added). Counsel's concession merely made explicit what was implicit throughout the PNA's briefs. At no point has the PNA challenged the methods of delivery that ITI and the AAA used to send notice, it has never denied receiving the numerous facsimile transmissions sent by ITI and the AAA, it has never complained that the notices should have been dispatched to an official other than the three to whom ITI sent notice of its Demand, nor has the PNA contested the validity of the signatures on the return-receipt cards or the authority of those persons to receive mail on behalf of the high-ranking officials to whom those notices were sent. All that the PNA can muster is a cryptic, and ultimately unilluminating, statement from Rachid that "I cannot confirm that the PNA ever received such notice." Decl. of Rachid ¶ 22.

■ Even when a party timely files a petition to vacate, courts have refused to upset an arbitrator's award on the hypertechnical ground that notice did not conform to the parties' underlying agreement.

*See, e.g., Gingiss,* 58 F.3d at 331 ("Inadequate notice is not one of [the] grounds [for vacating an award under the FAA], and the Bormets' claim therefore fails."); *Bernstein Seawell & Kove v. Bosarge,* 813 F.2d 726, 729–30 (5th Cir.1987) (affirming district court's conclusion that defendant had actual notice of arbitration where notice was sent to an address that he was currently using but different from the one specified in the partnership agreement); *Merrill Lynch, Pierce, Fenner & Smith v. Lecopulos,* 553 F.2d 842, 845 (2d Cir.1977) ("[N]o unfairness results from giving effect to the notice they actually received"); *Shamah v. Schweiger,* 21 F.Supp.2d 208, 215 (E.D.N.Y.1998) ("Shamah received actual notice and was not prejudiced by lack of notice via registered or certified mail."). Indeed, any result to the contrary would undermine the advantages that arbitration offers to parties engaged in a commercial transaction: "a quicker, less structured way of resolving disputes." *Dean v. Sullivan,* 118 F.3d 1170, 1173 (7th Cir.1997). A party who receives adequate notice of an arbitration proceeding, yet who elects to sit idly by in silence until the arbitration is complete, the award has been rendered, and the prevailing party has moved to confirm, cannot emasculate all that has been done by asserting a technical right for which there has been no substantive deprivation. Lest there remain any doubt that this is all that animates the PNA's notice objection, counsel's remarks dispel any doubt. Pressed to explain how any one of the many notices that ITI and the AAA sent to Gaza failed to provide the PNA with notice of the proceedings, counsel remarked:

> There is no question that the plaintiff has fax receipts indicating that faxes were received at PNA offices. But I suggest to Your Honor that the PNA *had a right and did take advantage of an opportunity* to have notices at a different location and they were entitled to receive notices at that location.

Tr. of Hr'g, June 4, 1999, at 33:10–:15 (emphasis added). Regardless of whether the PNA ever possessed a "right" to have notices directed to its Jericho address, the contours of that putative right are neither so broad nor so fixed as to permit the PNA to ignore notices that were actually sent to proper officials at otherwise proper addresses. What matters is that the "means employed [to serve notice] must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Mullane,* 339 U.S. at 315, 70 S.Ct. 652. The lengths to which ITI and the AAA went to appraise the PNA of the arbitration evince methods that one who genuinely wished to communicate with another would employ—methods that would almost certainly succeed. Accordingly, the Court determines that the PNA received adequate, if not actual, notice of the arbitration proceedings.

D. *Having received notice of the arbitration, the PNA is time-barred from asserting any grounds for vacating the arbitration award*

■ Having determined that the PNA received notice, the Court must resolve whether the PNA may now assert affirmative defenses to the contract, challenge the arbitrator's jurisdiction, or protest the alleged absence of an agreement to arbitrate. Whatever may be said for the merits of the PNA's potential defenses, pellucid statutory language and judicial precedent provide a clear, unambiguous answer: By ignoring the Demand and failing to petition to vacate the Award within ninety days after receiving it, the PNA may not exploit this summary confirmation proceeding by litigating now what it should have contested long ago.

Like the FAA, Virginia's arbitration act requires that any petition to vacate an arbitration award be filed "within ninety days after delivery of a copy of the award to the applicant." VA. STAT. § 8.01–581.010; *compare* 9 U.S.C. § 12 ("Notice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered."). While Virginia law explicitly permits a party to raise arguments that would support vacatur in response to another party's motion to confirm an arbitral award, it carefully qualifies that opportunity by mandating that "such response [be] filed within the prescribed time limits of this section [ninety days]." VA. STAT. § 8.01–581.010. Although the FAA does not speak directly to this issue, federal courts have construed the FAA to do implicitly exactly what Virginia's arbitration act does explicitly. As the Second Circuit has held, a party's "failure to move to vacate the award within the three month time provided [by 9 U.S.C. § 12] precludes him from later seeking that relief when a motion is made to confirm the award." *Florasynth, Inc. v. Pickholz,* 750 F.2d 171, 175 (2d Cir.1984). Far from anomalous, *Florasynth* and its conception of the FAA have garnered the endorsement of at least four other circuits. *See Val–U Constr. Co. v. Rosebud Sioux Tribe,* 146 F.3d 573, 578–79 (8th Cir.1998); *Cullen v. Paine, Webber, Jackson & Curtis, Inc.,* 863 F.2d 851, 853–54 (11th Cir. 1989); *Professional Administrators Ltd. v. Kopper–Glo Fuel, Inc.,* 819 F.2d 639, 642 (6th Cir.1987); *Taylor v. Nelson,* 788 F.2d 220, 225 (4th Cir.1986).

■ Any other result would do violence to the underlying purposes of arbitration in general and the FAA and the Virginia arbitration act in particular. As it is with Virginia's arbitration act, "[a] confirmation proceeding under 9 U.S.C. § 9 is intended to be summary: confirmation can only be denied if an award has been corrected, vacated, or modified in accordance with the [FAA]." *Taylor,* 788 F.2d at 225; *accord Cullen,* 863 F.2d at 854. Under Virginia law, it is even clearer that a court must confirm an arbitration award if no party has filed a timely petition to vacate or modify the award:

Upon application of a party any time after an award is made, the court *shall*

confirm an award, unless *within the time limits* hereinafter imposed grounds are urged for vacating or modifying or correcting the award, in which case the court shall proceed as provided in §§ 8.01–581.010 and 8.01–581.011.

VA. STAT. § 8.01–581.09 (emphasis added).

Looking at the undisputed facts in this case, it is clear that the PNA's defenses come too late in the proceedings for this Court to entertain them. After the Award was filed, the AAA sent it to the PNA on November 13, 1997. *See* Decl. of Graff ¶ 24; Decl. of Martinez ¶ 8. On November 26, 1997, UPS delivered the Award to the PNA, where it was signed for and received. *See* Decl. of Martinez at Ex. L (copy of the UPS Delivery Notification indicating that the Award was delivered on 11/26/97 at 3:52 P.M., and signed for by "SHALOM").[9] Ninety-six days later, on March 2, 1998, ITI filed its Motion to Confirm Arbitration Award in the District of Columbia Superior Court. The PNA did not remove that action to this Court until March 24, 1998. Because more than ninety days elapsed before the PNA petitioned to vacate the Award, it is foreclosed from raising its affirmative defenses.

■ Finally, the PNA suggests that the First Circuit's decision in *MCI Telecommunications Corp. v. Exalon Industries, Inc.*, 138 F.3d 426, 430–31 (1st Cir.1998), permits it to contest whether there existed an agreement to arbitrate regardless of whether the time to move to vacate has elapsed. For two reasons, *MCI* is not the panacea that the PNA hopes it is. At the most obvious level, *MCI* was applying the time limits set forth in section 12 of the FAA. By contrast, this Court is constrained to apply Virginia's arbitration act. While that statute and the FAA have a

great deal in common, the Virginia arbitration act, unlike the FAA, expressly addresses whether the ninety-day limitations period applies to challenges based on an absence of an agreement to arbitrate. Among the five bases upon which a party may predicate a petition to vacate an arbitration award is when "[t]here was no arbitration agreement and the issue was not adversely determined in proceedings [to compel arbitration] and the party did not participate in the arbitration hearing without raising the objection." VA. STAT. § 8.01–581.010. In the same section, Virginia arbitration act provides that "[a]n application under this section shall be made within ninety days after delivery of a copy of the award to the applicant." *Id.* Under Virginia law, therefore, a party who wishes to contest the existence of an arbitration agreement must proffer his objection within ninety days of receiving the award. This the PNA did not do.

Moreover, even were the FAA controlling here, *MCI* is distinguishable; more on point is the Seventh Circuit's decision in *Comprehensive Accounting Corp. v. Rudell*, 760 F.2d 138, 140–41 (7th Cir. 1985). While in *MCI* there was no written arbitration clause within the body of the parties' agreement, in *Comprehensive Accounting* there clearly was a "signed contract ... [that] contained a standard arbitration clause." *Id.* at 139. Even the First Circuit recognized this salient difference. *See MCI*, 138 F.3d at 431. As Judge Posner wrote for a unanimous panel in *Comprehensive Accounting:*

The Rudells had that opportunity [to contest the existence of an arbitration agreement] when they were notified of the arbitration, and they let it pass by. It was then too late for them to sit back and allow the arbitration to go forward, and only after it was all done, and en-

9. Again, the PNA has never contested the authenticity of the signatures on the return-receipts nor has it suggested that those who signed for and received notices from ITI and the AAA lacked authority to accept mail on behalf of the PNA or any of its high officials.

Of course, under AAA Rule 40, it is not clear that such agency concerns would even be relevant. *See* AAA R. 40 (requiring that notices served by mail only be *addressed* to the party or its representative).

forcement was sought, say: oh by the way, we never agreed to the arbitration clause. That is a tactic that the law of arbitration, with its commitment to speed, will not tolerate.

*Comprehensive Accounting,* 760 F.2d at 140. The same can be said of the PNA. Article 3 of the Agreement contains a standard arbitration clause, and both the Agreement executed by the PLO and the one executed by the PNA are signed by Yasser Arafat, PLO Chairman and PNA President. Having received notice of the arbitration and the Award that was eventually filed, the PNA cannot delay ITI's confirmation proceeding at this point. Accordingly, whether under the Virginia arbitration act or the FAA, the PNA is time barred from raising any defense to ITI's motion to confirm—even an objection to the existence of an arbitration clause.

### III. Conclusion

For the foregoing reasons, ITI's Motion to Confirm Arbitration Award is granted.

### ORDER

For the reasons expressed in the accompanying Memorandum Opinion, it is, this 22 day of June, 1999, hereby

**ORDERED** that the Motion to Confirm Arbitration Award filed by International Technologies Integration, Inc. ("ITI") shall be, and hereby is, **GRANTED**; and it is

**FURTHER ORDERED** that the Arbitration Award filed with the American Arbitration Association on November 13, 1997, and delivered to the Defendants Palestine Liberation Organization ("PLO") and Palestinian National Authority ("PNA") on November 26, 1997, which awarded $18,750,000 to ITI shall be, and hereby is, **CONFIRMED**; and it is

**FURTHER ORDERED** that **JUDGMENT** shall be, and hereby is, entered in favor of ITI and against the PLO and the PNA in the amount of $18,750,000.

**SO ORDERED.**